STATE OF MAINE                                  BUSINESS AND CONSUMER COURT
Cumberland, ss.                                 Location: Portland
                                                Docket No.: BCD-FM-14-02 ✓

TIMOTHY W. HARPER,                    )
                                     )
                Plaintiff            )
                                     )
         v.                          )
                                     )
SHERYL E. HARPER,                    )
                                     )
                Defendant            )

## FINAL DIVORCE JUDGMENT

This Final Divorce Judgment is issued to address certain matters raised in Plaintiff's

Motion for Reconsideration and to Amend Divorce Judgment Pursuant to M.R. Civ. P. 59(e);

the Addendum thereto; Defendant's Objection, and Plaintiff's Reply to Defendant's Objection.

Oral argument on the Motion was held November 10, 2016. Based on the entire record, the

court finds and concludes as follows:

### I.    Background

Plaintiff Timothy W. Harper and Defendant Sheryl E. Harper were married in New

York in July 1978. Both are presently in their late fifties. They have four adult children.

During the 36 years of the marriage,[1] they started several businesses and accumulated

substantial real property and other assets. With the exception of certain assets gifted to or

inherited by one party or the other, all of the assets owned separately or jointly by the parties

are marital assets.

The marital businesses are as follows:

---

[1] This court issued a divorce in February 2015, on the basis of M.R. Civ. P. 115(b), authorizing the court to grant a divorce notwithstanding the pendency of other claims or counterclaims in the case.

- The McKinley Market, a convenience store and gas station in the Bass Harbor community in the Town of Tremont. In addition to the store, the parties' marital property includes adjacent parcels occupied by two storage buildings and two residential buildings. [McKinley Market and the adjacent properties are collectively sometimes referred to herein as "the Tremont properties"]. The convenience store/gas station business is owned by Ruby Red, Inc., a corporation of which Defendant is the sole shareholder. The Defendant has been responsible for managing the operation of the convenience store and the rental of the Tremont properties.

- The Dictator, a scallop fishing boat based in Massachusetts. The boat is owned by Dictator, Inc., a corporation of which Plaintiff is the sole shareholder. The Dictator, Inc. assets include permits to fish and several operating accounts. The debt associated with the Dictator includes a loan from The First as well as a line of credit. Plaintiff has always been responsible for managing the operations of Dictator, Inc., although the fishing is handled by a hired captain and crew.

- North Eastern Seafood, Inc. (NES), an incorporated seafood sales business doing business under the names of Fish Unlimited and Southwest Lobster, operating out of a wharf and storage facility located at 126 Clark Point Road, Southwest Harbor ["the Wharf property"]. Early in the parties' marriage, Defendant started the Fish Unlimited business by selling fish while Plaintiff worked on the parties' fishing boat. At some point before this case was brought, Plaintiff took over primary responsibility for managing the operations of NES, although he turned over responsibility to the Defendant toward the end of 2015. The assets associated with NES include inventory and equipment and several operating

2

accounts. Debt associated with NES consists of two lines of credit, with Machias Savings Bank and The First.

- Commercial and residential property on Seawall Road, Southwest Harbor, Maine ["the Seawall property"]. The property consists of a residence, two warehouses and a large lot of just under 10 acres. Plaintiff has been managing the Seawall property and collecting rents.

- Sheryl Rentals and Harper Rentals, two property rental businesses operated separately by Defendant and Plaintiff respectively. Each business has an operating account in the name of the party in question.

Although some of the businesses are owned by corporate entities of which one or both parties are the sole shareholders, those businesses as well as the parties' rental businesses were initiated and developed during the parties' marriage, and all of the corporate entities were formed during the parties' marriage. All of the businesses constitute marital property.

In addition to the businesses, the parties own several real properties and substantial tangible and intangible personal property, all of which are discussed below.

## II. Procedural History

This case has been pending for almost four years. It was filed in the Ellsworth District Court in October 2012, and was transferred to the Augusta District Court in September 2013. The Augusta District Court held hearings in this matter on December 19, 2013 and March 4, 2014. On April 1, 2014, the District Court entered its First Interim Order, awarding Defendant exclusive possession of the parties' real estate located at 60 Beech Hill Road in Mount Desert, Maine, and awarding Plaintiff exclusive possession of the parties' real estate located at 68 Mountain View Road in Sullivan, Maine.

3

The First Interim Order further allocated between the parties responsibility for the operation of the five marital businesses. The Defendant was assigned responsibility for operating the McKinley Market business and property, as well as the Sheryl Rentals business. Plaintiff was assigned the responsibility to operate the NES seafood business; the Harper Rentals business, and the Dictator, Inc. fishing boat.

The First Interim Order also established responsibilities for payment of health insurance, automobile insurance, commercial and liability insurance, living expenses, monthly expenses, necessary repairs, and tax obligations.

In the Second Interim Order, issued on November 14, 2014, the District Court determined that the parties could each withdraw $30,000 from the NES Investment account for litigation expenses and that, if the parties agree, they could withdraw the remaining funds of approximately $8,416 from that account. The Second Interim Order further required a $25,169 tax refund be paid to Defendant and that Plaintiff pay Defendant an additional $19,357 to equalize the parties' 2013 income.

More than two years after it was filed, this action was transferred to the Business and Consumer Court in November 2014.

This court divided trial of the case into two phases. Phase I addressed the valuation of the parties' real estate, the valuation and allocation of intangible non-business personal property, the extent to which the parties' investments in accounts with H.M. Payson are marital property, and issues relating to the parties' insurance coverage. All other issues were reserved for Phase II.

Phase I of the trial was conducted, in part, on January 28 and 29 of 2015. While Phase II of the trial was scheduled to begin on February 23, it—and the conclusion of Phase I—was postponed following a conference with the parties and their counsel on that day. Essentially,

4

the postponement was the result of a change in direction agreed on by the parties, involving the sale of the Ruby Red and Wharf properties and the appointment of a referee whose duties would include overseeing the marketing and sale of the properties.

Three days later, at the Plaintiff's request, the court held a hearing and granted a final divorce judgment notwithstanding the pendency of other claims, pursuant to M.R. Civ. P. 115(b), reserving jurisdiction to decide all remaining issues and reserving all claims and defenses of the parties. The following day, February 27, 2015, the court issued an Amended Interim Order that, among other things, appointed John Fidrych, CPA, MBA, as Referee and tasked him with the sale of the Ruby Red and Wharf properties and oversight of the parties' businesses, including Dictator, Inc.

Phase I of the trial resumed on April 28, 2015 after which the court entered an Order addressing issues relating to the H.M. Payson Account numbered #3108 and determined that only the 700 shares of Apple stock in the Account were Defendant's non-marital property.

Over the next months, the Referee arranged for the Ruby Red and Wharf properties to be listed for sale through brokers, and eventually an offer was obtained on the Wharf property. Although the offer was for a price in the range of what the parties deemed the Wharf property to be worth, the Defendant essentially changed her mind about agreeing to sell the Wharf.

On August 12, 2015, Defendant filed a motion to amend the February 27, 2015 Interim Order seeking, amongst other things, to remove Plaintiff from management of Dictator, Inc.— a scallop fishing operation— and to place herself in charge. Plaintiff filed a cross motion to amend, and the court scheduled a hearing on these motions for November 2, 2015.

On October 20, 2015, Plaintiff's counsel moved to withdraw. On November 3, 2015, the court granted the motion to withdraw and amended the February 27, 2015 Amended Interim Order to transition operational responsibility for NES from Plaintiff to Defendant by December

5

1, 2015. Based on the Defendant's change of position regarding sale of the Wharf property, the court also modified the Amended Interim Order to postpone the sale of that property and to reject an outstanding offer to purchase that property. On November 16, 2015, Plaintiff's current counsel entered her appearance.

On January 7, 2016, Defendant filed a motion to enforce the court's November 3, 2015 Order alleging that Plaintiff was not cooperating in, and was actively impeding, the effective transition of control for NES to Defendant. This motion was consolidated for final hearing and remains pending. On March 7, 2016, Plaintiff filed a petition for distribution of funds to pay income taxes and his attorney fees. On March 28, 2016, this court ordered an advance of attorney fees, subject to reallocation. Plaintiff's petition for distribution of funds to pay income taxes was also consolidated for final hearing and remains pending.

On April 4 through 7 of 2016, Phase II of the trial was conducted. The court requested that the parties file their proposed findings of fact and conclusions of law by May 23, 2016, with reply memoranda marking up the other's proposed findings by June 6, 2016. As of June 6, 2016, the court took the case under advisement.

### III.   Governing Standards

In a divorce action, "the court shall set apart to each spouse the spouse's property and shall divide the marital property in proportions the court considers just after considering all relevant factors." 19-A M.R.S.A. § 953(1). In doing so, the court must consider "[t]he contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker; [t]he value of the property set apart to each spouse; and [t]he economic circumstances of each spouse at the time the division of property is to become effective...." *Id.*

6

The statute provides for a "just" distribution, which is "not synonymous with an equal distribution...." *Warren*, 2005 ME 9, ¶ 45, 866 A.2d 97. Courts are not required to divide marital property equally, but are instead required to make the division fair and just considering all of the circumstances of the parties. *Id.* (quoting *Murphy v. Murphy*, 2003 ME 17, ¶ 27, 816 A.2d 814. Thus, the court may consider if one party's contributions to a marital asset were greater than the other party's in allocating marital property. *Bond v. Bond*, 2011 ME 54, ¶ 17, 17 A.3d 1219.

Furthermore, "the value of marital assets should be determined as of the time they are distributed without reference to possible future events." *Dubord v. Dubord*, 1997 ME 7, ¶ 12, 687 A.2d 647 (quoting *Bayley v. Bayley*, 602 A.2d 1152, 1154 (Me. 1992)). Accordingly, "[u]nless the sale of assets is ordered by the court, or a party makes clear that they intend to sell the property, future tax consequences need not be considered." *Id.* Marital debt is apportioned pursuant to the same considerations as the division of marital property. *Arey v. Arey*, 651 A.2d 351, 354 (Me. 1994).

Where the circumstances indicate that a spouse engaged in economic misconduct, this behavior may factor into the equitable distribution of property and the award of spousal support. *Ahern v. Ahern*, 2008 ME 1, ¶ 22, 938 A.2d 35. This issue is discussed further below in the context of specific allegations of economic misconduct.

IV.    *The Question of Whether to Allocate or Sell the Three Primary Marital Businesses*

One of the larger questions in this case is whether the three primary marital businesses—the McKinley Market convenience store and related real estate; the Southwest Lobster seafood business and related real estate, and the Dictator, Inc. fishing boat and associated fishing rights—should be allocated to one party or the other, or should be sold, with the net proceeds of sale divided. Plaintiff proposes that he be allocated the Dictator, Inc.

fishing boat and the associated fishing rights, and that the Defendant be allocated Ruby Red and Wharf businesses and related properties. Defendant, however, does not want to be allocated the Ruby Red and Wharf properties; she, too, would like to be awarded the Dictator, Inc. business, and in the alternative, she proposes that all three be sold and the proceeds of sale divided.

Based on the entire record, the court is in agreement that all three of the primary businesses (and related property) should be sold and the proceeds allocated, for the following reasons:

- Both parties are in their late fifties. Both have worked hard, and both are entitled to reap the financial benefits of their efforts over the course of the marriage.

- The convenience store business and the seafood business are both labor-intensive, requiring extensive time and energy to operate them. Both businesses have struggled financially for various reasons. Neither party wants to be awarded either the convenience store business and the related Tremont properties or the seafood business and the related Wharf property.

- The value of Ruby Red, Inc. and the Tremont properties is difficult to assess. As noted above, these properties were listed for sale for some time, with little success. To award the properties to either party is to saddle that party with an asset of dubious value that will require large amounts of time to manage, even pending a sale.

- The real estate associated with NES, on the other hand, is marketable.

- The Dictator fishing boat is the plum asset in the parties' marital property portfolio—it generates very substantial income and requires little time and effort to manage compared to the NES and McKinley Market businesses, because the fishing is done by a hired captain and crew.

8

- The values attached to the parties' assets mean that, to achieve a just and equitable division, one party would have to be awarded the two businesses that neither party wants and the other party would have to be awarded the Dictator, Inc. business, which both parties want.

- Lastly, were the Plaintiff to be awarded the Dictator, Inc. stock outright, a just and equitable allocation would require that he pay substantial spousal support for a substantial period of time. Perhaps in recognition of that potential, Mr. Harper expressed a clear preference for an allocation that permitted the parties to move into the future without any continuing financial connection. Selling all three of the primary businesses enables the court to make a just and equitable allocation of the parties' marital property without an award of spousal support.

In light of these factors, this Judgment provides for the three businesses to be sold under the supervision of the Referee, unless the parties stipulate in writing to some other procedure for sale or disposition of the properties.

Moreover, this Judgment provides for the sales of properties to be conducted under the supervision of the Referee, unless the parties stipulate in writing to a different procedure. The court recognizes that the Referee's involvement will be an added expense, but the history of this case, the extent of contested issues and the magnitude of the litigation effort all argue strongly against leaving it to the parties to decide how to sell the assets in question. If the parties come up with a joint detailed alternative and seek to modify this Final Divorce Judgment accordingly, the court will certainly consider it.

## V.    *Stipulated Allocations*

The parties have reached a number of stipulations as to the allocation of certain properties, mortgage debts, and accounts. These stipulated allocations are reflected in the table

9

attached to this decision below. The reasonable preferences of the parties should be considered when dividing marital property. *See Norton v. Norton*, 443 A.2d 75, 76 (Me. 1982). The court concurs with the parties' stipulated allocations as set forth in the attached table and orders the assets and liabilities in question so divided.

While Defendant stipulates to the allocation and valuations, she requests that the court take into consideration each party's contribution to the acquisition of their marital real estate. *See Bond v. Bond*, 2011 ME 54, ¶ 17, 17 A.3d 1219. The court has done so, and finds that the parties have contributed equally, meaning that no adjustment to the stipulated values is necessary or appropriate.

*VI.     The Tremont Properties and Ruby Red, Inc. d/b/a McKinley Market*

Neither Plaintiff nor Defendant wishes to retain possession of the so-called Tremont Properties which consist of real estate located at: 1) 42 Tremont Road—Market and Gas Station; 2) 44 Tremont Road—2 warehouses; 3) 52 Tremont Road—Residential Duplex; and 4) 21 Harbor Drive—Single Family Residence. Similarly, neither party seeks to retain ownership of the S-Corporation, Ruby Red, Inc., which operates the McKinley Market located at 42 Tremont Road. The Tremont Properties were purchased in 2007 based on the advice of the parties' accountant to obtain a property that could generate tax losses to offset the income anticipated from Dictator, Inc. Prior to 2012, Plaintiff and Defendant each owned 50% of the stock in Ruby Red, Inc. In 2012, Plaintiff transferred his 50% share to Defendant, apparently without her knowledge.

Under the supervision of Referee Fidrych, the Tremont Properties were listed for sale in 2015 with a call for offers. The only offer received was for a portion of the property—a "green building" garage and it was not accepted. The Tremont Properties were re-listed at some point after February 22, 2016, but have yet to attract any offers. The parties agree that

10

Ruby Red, Inc. owes $1,727 under The First Checking Account #5226 and $30,000 under The First Overdraft #5226. They also agree that Ruby Red, Inc. has assets of $527 in The First Payroll Account #0394 and that the Tremont Properties are encumbered by a mortgage from The First in the amount of $752,800. The parties dispute, however, the value of the Tremont Properties and the value of Ruby Red, Inc.'s remaining business assets and liabilities.

Defendant proposes that the Tremont Properties and all assets owned by Ruby Red, Inc. be sold in a commercially reasonable manner. She proposes that the gains or losses realized through the sell be split evenly between herself and Plaintiff. Plaintiff proposes that the Tremont Properties and Ruby Red, Inc. be distributed to Defendant as she is the 100% shareholder of Ruby Red, Inc. and has historically controlled the properties.

For the reasons presented in section IV, *supra*, the court determines that the Tremont Properties and the assets of Ruby Red, Inc. shall be sold off in a commercially reasonable manner and that the proceeds of sale (net of applicable commissions and closing costs) shall be divided between the parties. This is because neither party wishes to retain the assets and the evidence indicates that the Tremont Properties and Ruby Red, Inc. were purchased by the parties as a means to obtain tax benefits. Given that the properties and the corporation were obtained with the best interests of both parties in mind, given that the parties disagree over the value of the Tremont properties, and given that neither party wants the properties or assets, a sell in which the gains or losses are split equally is a just result.

Because the Tremont properties and the assets of Ruby Red, Inc. are to be sold, their actual value need not be established for purposes of an equitable allocation although it is relevant to whether there is a need for spousal support and also relevant to the sale of the properties. Based on the absence of offers on the real estate and based on the historical performance of the convenience store/gas station, values lower than those established by the

11

parties' appraiser, Webersinn Appraisal, Inc., are appropriate. For purposes of determining the need for spousal support to either party only, the court adopts a value of $400,000 for the Tremont real estate properties, including the market and gas station facilities, and a value of $200,000 for the ownership interest of Ruby Red, Inc.

As noted below, the Defendant has appropriated about $30,000 in income from Ruby Red, Inc. for her own purposes. This amount is imputed to her in the attached table. Plaintiff asks that she be required to reimburse him for his presumptive half of the amount. However, because the court has factored each party's receipt of income from the various businesses into the overall allocation set forth in the attached table, to require reimbursement would in effect be double counting. Thus, the net proceeds of sale of the Ruby Red, Inc. assets and the Tremont real estate will be divided equally between the parties.

The procedure for sale is set forth later.

VII.    *Northeastern Seafood, Inc. and 126 Clark Point Road*

NES is a commercial lobster business in which the parties are both 50% shareholders. NES operates out of the land and buildings located at 126 Clark Point Road, Southwest Harbor, Maine (the "Wharf"). NES buys lobsters from fishermen, sells lobsters to commercial and retail customers, and supplies bait, salt, and fuel to fishermen. Defendant founded the business in 1986 as Fish Unlimited and mainly through her own effort grew it into a successful business. Plaintiff contributed to the growth of Fish Unlimited by catching seafood, but it was mainly Defendant's talent, time and energy that grew the business. Somewhat later, as early as 1997 but perhaps as late as 2005, Plaintiff took over primary responsibility for managing the business, and did so until this court's November 3, 2015 Interim Order pursuant to which Defendant was to assume responsibility for the business operations of NES.

12

During the pendency of the case, the parties agreed that the Wharf property be put up for sale. The listing produced a $1,500,000 offer to purchase the Wharf, but the Defendant changed her mind about selling the Wharf and the property was taken off the market.

Plaintiff asserts that the Wharf's fair market value is $1,950,000, consistent with Theodore Webersinn's October 2, 2013 appraisal. Plaintiff claims this valuation is supported by Defendant's rejection of an offer to buy the Wharf for $1,500,000 as too low. However, although he values the Wharf property highly, Plaintiff does not propose the property be allocated to himself, Instead, Plaintiff proposes that the Wharf be allocated to Defendant as her sole and exclusive property and that she bear responsibility for all outstanding debt, including mortgages, equity loans, commercial lines of credit, taxes, insurance and all other costs associated with the Wharf. Plaintiff further proposes that Defendant be allocated full ownership of NES along with its business assets and liabilities. Plaintiff requests that Defendant be required to refinance the mortgage debt on the Wharf, or otherwise remove Plaintiff as a named debtor or guarantor on these loans within 90 days from the entry of this Order.

For the reasons given in section IV above, the Wharf real estate and the associated trucks, trailers and other items will be sold and the other assets of NES will be liquidated as well. For purposes only of determining whether there is a need to award spousal support to either party, the court fixes the value of the Wharf property, the net value of NES, and the associated structures and equipment at $1,600,000.

As of February 29, 2016, the parties agreed that the balances in the NES checking accounts are $10,000 in Machias Savings Bank #5990, $2,667 in Bar Harbor Bank & Trust #7043, and $22,490 in The First #0386. Furthermore, NES owes $248,787 under The First Line of Credit #1738 and $96,973 under the Machias Line of Credit #3745. Neither party

13

appears to think that the NES business has any particular value (i.e. goodwill) as a going concern, independent of the value of the Wharf property.

However, Defendant makes allegations of economic misconduct in connection with the Plaintiff's operation of NES. These allegations and Plaintiff's response are discussed below.

The funds in the two checking accounts with The First numbered -0386 and -0394 and the funds Bar Harbor Bank & Trust Account #7043 are operating accounts for use in the operations of NES. Any balance left after sale will be equally divided. The tractor-trailer trucks, refrigerated trailers, and refrigerated box trucks owned by NES be sold with the net proceeds split equally since neither party wishes to retain them. The remaining assets of NES, Defendant asserts, consist of office equipment and equipment related to the dock operation, which are valued at less than $15,460.

## VIII.   *The Dictator, Inc.*

Plaintiff is the sole shareholder of Dictator, Inc., which owns a scallop fishing boat and associated fishing permits. Plaintiff began scallop fishing in 1979 when he and the Defendant first moved to Maine.   Over the years, Plaintiff has developed the Dictator into a profitable business. He was actively involved in the Dictator's operations, but in recent years has taken on a managerial role, with a hired captain and crew doing the actual fishing.

The parties agree that the combined fair market value of the fishing vessel Dictator, including its equipment and federal permit, is $4,500,000. The parties also agree that the vessel is encumbered by a primary loan to The First for $317,560 as of February 29, 2016 under The First Account #8249. Furthermore, the parties agree that the Dictator has an operating account with The First ending in #2028 with a balance of $44,942, a Capital Account with HM Payson ending in #3171 with $160,049.50, and a Line of Credit with the First ending in #7143.

14

Plaintiff asserts that the amount currently owed on the #7143 Line of Credit is $100,000, while Defendant asserts it is only $80,000.

Plaintiff proposes that the Dictator, Inc., including all of its assets, be set aside as his sole and exclusive property. Plaintiff agrees to assume responsibility for all liabilities associated with the business and will indemnify and hold Defendant harmless against the same. Plaintiff also argues that the court should take into account the inherent tax on the recovered depreciation of the boat should it be sold. Plaintiff and Thomas O'Donnell, the accountant at MacDonald Page, LLC who has done tax work for Dictator, Inc., calculate the tax liability in the event of a sale to be $504,900. Plaintiff and Mr. O'Donnell further calculate that the 2015 income taxes owed by Plaintiff on the Dictator Inc.'s income is $191,366. Plaintiff contends that all of the Dictator's 2015 income was used to finance the parties' expenses and fees in this matter, the corporate line of credit has been maxed out, and there is no other money available to pay these taxes. While Plaintiff filed for extensions to pay the taxes, he suspects it may not be granted and he may be charged a penalty of somewhere between 5% and 25% of the taxes due per month until his return is filed. This could result in an additional liability of $47,000.

Plaintiff further contends that pursuant to the April 1, 2014 Interim Order, the profits from Dictator, Inc. were distributed to pay the parties' respective expenses in uneven shares favoring Defendant. Specifically, Plaintiff received $6,000 per month and Defendant $10,000. The $4,000 difference between the parties was to cover the mortgage on the residence in which Defendant resides. In February 2015, the Interim Order was amended to provide Plaintiff and Defendant with $7,500 each and a payment of $3,645 to Defendant for the mortgage. Plaintiff contends that since he has received less than 50% of the benefit from all of Dictator Inc.'s profits, it is fair to include 100% of the tax liability on the income as an obligation of the marital

15

estate and makes sense to reduce the value of Dictator, Inc. by its present and prospective tax liabilities.

Defendant proposes that the fishing vessel and its permit be sold by a commercial marine broker at the end of the 2016 fishing season. In support of this position, Defendant contends that the boat fishes out of Fairhaven, Massachusetts and that Plaintiff's operation and management of Dictator, Inc. requires minimal time and effort. Defendant further asserts that Plaintiff has improperly used Dictator, Inc. corporate funds for his personal benefit, claimed personal expenses as business expenses on the Dictator, Inc.'s corporate tax returns, and mismanaged the operation of the Dictator, Inc. to the detriment of the marital estate. She argues that Plaintiff's financial misconduct benefited him, to the detriment of the marital estate, by approximately $330,534. Like Defendant's other allegations of economic misconduct, these allegations are discussed below.

For the reasons indicated above, the assets of Dictator, Inc., including the vessel and all tangible and intangible property related to it, will be sold under the supervision of the Referee after the 2016 fishing season, unless stipulated otherwise by the parties. The Dictator capital account (-3171) may be used to fund Dictator's expenses pending sale, and after sale any balance shall be divided equally between the parties. The court agrees with the Plaintiff that any and all taxes, interest and penalties due, both with respect to income earned by Dictator, Inc. and with respect to the sale of the assets of Dictator, Inc., should be shared between the parties. This is just and equitable only because the court is addressing economic misconduct on the part of Plaintiff separately.

*IX.    Personal Property*

A. Snowmobiles and Motorcycles

Defendant asserts that at the time of Phase I of the Trial in January, 2015, the parties owned eight snowmobiles. Defendant values these snowmobiles, based on the NADA Guide, at a total of $85,000. Plaintiff contends that the parties only own seven snowmobiles and estimates their value to be $43,600. Plaintiff also asserts that any expenditures made on the snowmobiles were with his own personal debt, for which he has accepted sole responsibility. If the court does not accept the values Plaintiff proposes, he requests that the five snowmobiles purchased prior to the divorce be allocated to the Defendant at her estimated value. As indicated in the attached table, the parties' snowmobiles are awarded to Defendant at the total value she has assigned to them.

The parties have three motorcycles. Defendant proposes that she receive the 2006 Harley FLSTN1 Heritage Softail, while Plaintiff receives the 1986 Harley FXRS Liberty and 2010 Harley FLXH Street Glide. Plaintiff disagrees with her allocation only to the extent the court accepts Defendant's valuations, in which case Plaintiff requests that all of the motorcycles be allocated to Defendant. The court has assigned values to the three motorcycles and accessories and allocated them as shown in the attached table.

B. Power Tools, Hand Tools, and Other Machinery and Equipment

Defendant contends that a conservative estimate of the value of Plaintiff's collection of tools, equipment, and machinery is $200,000. Plaintiff disputes this value and requests that if the court accepts Defendant's valuation, the tools and equipment be allocated to Defendant at said value. The court does not accept Defendant's valuation and finds it just and equitable to allocate to Plaintiff the tools, equipment and machinery at the value of $50,000 as set forth in the table attached to this order.

17

C.  The Mercedes 280i

Defendant requests that she be awarded a Mercedes 280i as her non-marital personal property.  Plaintiff responds that the car does not belong to either party and was left by someone in storage who never paid the bill.  It is not clear how Plaintiff proposes the car be allocated or disposed of.  The court allocates the Mercedes 280i to Defendant, subject to a condition that she indemnify the Plaintiff against any liability to any third party associated with the vehicle.  Given that it is either non-marital property or property owned by a third party, no value needs to be assigned to the Mercedes for purposes of the allocation.

D.  Equipment, Watercraft and Trailers

The attached table contains a list of various equipment, watercraft and trailers.  The court finds it just and equitable to allocate these items at the indicated values as set forth in the table attached to this order.

Furthermore, the parties agree to sell a 2011 Massey Ferguson Tractor with accessories in a commercially reasonable manner and to split the proceeds equally.  Unless the parties agree otherwise, Defendant will contact Union Farm Equipment in Union, Maine and Kramer's Equipment in Sidney, Maine and, on the parties' behalf, sell the tractor to the company who will pay the higher price.

E.  Maps at the Sullivan Camp and Furnishings and Goods from 60 Beech Hill Road

Plaintiff is awarded the maps at the Sullivan Camp located at 68 Mountain View Road, as they were a gift.  Except for items allocated by agreement, which are listed in the next section, Defendant is allocated all goods and furnishings at 60 Beech Hill Road and Plaintiff is allocated the goods and furnishings at the Sullivan Camp.  Any disparity in value between the goods and furnishings at the Sullivan Camp and 60 Beech Hill Road is not significant.

18

F.  Stipulated Distributions of Tangible Personal Property

The court allocates the items listed below to the party indicated and at the values stated. Where no value is assigned, it is because the item was a gift to a party or inherited by a party, or is not of significant value, and thus need not be assigned any value in the table.  An X in the table indicates the item is either non-marital or has no value that would be material to the overall allocation.

| Assets/Liabilities | Plaintiff | Defendant |
| --- | --- | --- |
| Coins to Plaintiff | $11,414.00 | |
| Tiger Woods Card Collection to Plaintiff | $5,000 | |
| Grandfather's Saw to Plaintiff | X | |
| Assorted Silver, China, Pictures and Family Memorabilia to Defendant | | X |
| Jewelry to Defendant | | X |
| Plaintiff's Grandfather's Album to Plaintiff | X | |
| Old Tin Picture of Plaintiff's Family to Plaintiff | X | |
| Two Push Mowers to Plaintiff | $50 | |
| Plaintiff's High School Ring to Plaintiff | X | |
| Chain Saw to Plaintiff | X | |

The parties dispute who should receive items referred to in their filings as the Marble game and the Old Propeller from the Dictator.  The Marble Game is awarded to Defendant and the Old Propeller is awarded to Plaintiff, with neither item having value material to the overall allocation.

X.      <em>Intangible Personal Property</em>

A.  Funds in Plaintiff's Safe Deposit Box

Defendant asserts that Plaintiff has $50,000 in a safe deposit box.  Plaintiff initially stated that he had $36,000 in the safe deposit box, but then corrected that calculation to $32,500.  Both parties agree that the money in Plaintiff's safe deposit box should be allocated to

him. Plaintiff's proposed findings assign a value of $36,000, and awards those funds to him, and the court agrees.

B. Funds in Defendant's Safe Deposit Box

Plaintiff asserts that Defendant has $200,000 in a safe deposit box. He asserts that this amount was based on the last time he accessed Defendant's safe deposit box in 1998. Plaintiff claims that the dates of Defendant's trips to the safe deposit box do not coincide with the dates and events she asserts the money was taken out for. Accordingly, Plaintiff asserts that Defendant is in possession of and should be allocated the $200,000 from her safe deposit box.

Defendant responds that since Plaintiff's last entry to the box in 1998, she accessed it once in November 2001, three times in August and September 2002, once in July 2003, and then not again until February 10, 2014. Defendant's February 10, 2014 visit to the box, she asserts, was to enable her to respond to an interrogatory inquiring about the contents of the box. Defendant testifies that she took out money in the safe deposit box in 2001, 2002 and 2003, and that there was no money in the box when she went to the box to answer Plaintiff's interrogatories. Accordingly, she asserts that she should not be allocated any funds for the amount in the box, as there is nothing left.

The court accepts Defendant's testimony on this point, and finds that she removed the funds many years before this divorce case was filed and used the funds for the benefit of both parties. The court therefore makes no award to either party.

C. H.M. Payson Brokerage Account #3108

The parties' H.M. Payson Brokerage Account #3108 has a value of $834,728 as of the date of trial. Of the assets in the account, 700 shares of Apple, Inc. stock are Defendant's non-marital property, and the remaining assets are marital.

20

As indicated in this court's October 20, 2015 Order, the Brokerage Account initially consisted of non-marital assets from Defendant—including the Apple stock—totaling $492,669 and marital assets totaling $150,110. Over time, the value of the account increased by approximately $220,000. The Order concluded that although Defendant contributed approximately three-quarters of the value to the Brokerage Account in non-marital funds, the only non-marital property that had not been extensively commingled over time was the Defendant's 700 Apple stock. The Order also found and concluded that it was not possible to determine to a certainty the extent to which the substantial increase in value of the account was due to the original marital component as opposed to the original non-marital component.

With this analysis in mind, the court reaffirms its determination that the 700 Apple stock are Defendant's non-marital property. However, based on her substantial contribution to the account of $492,669 in non-marital funds that have been inextricably commingled with the originally contributed marital funds, the court concludes that it is just and equitable to award the Defendant 65% of the value in the brokerage account ending in -3108, and to award the remaining 35% to Plaintiff.[2] (Economic misconduct is not a factor in this determination).

D. H.M. Payson Brokerage Account #4103

Before Phase II of the Trial, the parties stipulated that the value of H.M. Payson Brokerage Account #4103 was $583,995. Subsequently, the court ordered payment of $40,000 from this account for attorney fees by Order dated March 28, 2016. Accordingly, Brokerage Account #4103 has a present value of $543,995. Plaintiff requests that the assets in Account #4103 be used to pay the amounts owed to MacPage, LLC for work performed by it related to tax years prior to 2015. Plaintiff requests that the remainder be split such that 78% go to

---

[2] Defendant requests that she be awarded her non-marital Apple stock and 76% of the marital funds in the account based on her non-marital contributions of $492,669 being 76% of the total amount originally deposited into the account. However, the Apple stock that is being awarded as a non-marital asset was part of her non-marital contribution, so the actual ratio of her non-marital contribution to the original total amount contributed is less than 76%.

Plaintiff and 22% to Defendant. Defendant counters that all of the money in Account #4103 came from money saved by Defendant in a predecessor account during her operation of NES prior to 2005. She asserts that no further contributions were made after 2005 and, as a result, the court should allocate the entire amount to Defendant due to her contributions to the account and Plaintiff's mismanagement and misappropriation of marital property.

Although the evidence does, to an extent, support the Defendant's contention that her efforts more than Plaintiff's account for the funds in this account, Plaintiff could make the same argument about the very significant income that the Dictator has generated over the years. It was his effort, more than Defendant's, that led to the financial success of the Dictator, which has been far more profitable than either Ruby Red, Inc. or NES in recent years. Accordingly, Defendant's argument regarding this account is not accepted by the court.

As to MacPage, Defendant asserts that MacPage has not submitted an itemized bill for services and, as a result, the court should not make any determination of the amount owed or allocate responsibility for any debt owed MacPage. As to the MacPage debt, the court agrees that no determination of the amount owed is necessary, but does allocate responsibility to each party for one-half of the liability to MacPage for accounting work that benefited both parties.

E. The Parties' Individual Accounts

The parties have agreed that the following five individual accounts should be distributed to the individual in whose name the account was created without consideration of the account values since they are made up of post-divorce funds:

1. Defendant's The First Savings Account #6651;

2. Defendant's The First Checking Account #2477;

3. Defendant's Camden National Bank Account #4957;

4. Plaintiff's The First Checking Account #0822; and

22

5. Plaintiff's Camden National Bank Account #4957.

The parties have also agreed that Plaintiff should be solely responsible for the debts at Machias Savings Bank Line of Credit #1165 and Machias Savings Overdraft #7250. The parties further agree that these debts should be allocated to Plaintiff without consideration of the obligations in the allocation of marital property. The court concurs with the parties' stipulations and orders the above-mentioned accounts so allocated.

F. The Boat Moorings

Plaintiff requests that the parties' boat moorings, one in Somes Sound and one in Southwest Harbor, be set aside to him as his sole and exclusive property since he is the one who utilizes them. Defendant requests that she be awarded both moorings and also responds that Plaintiff should not receive them because he has no connections to Southwest Harbor in light of his lack of interest in maintaining control of NES and the Wharf. Plaintiff is awarded the Somes Sound mooring. The Southwest Harbor mooring will be sold with the Wharf property or as an asset of Northeastern Seafood, Inc.

G. Plaintiff's Rental Income from the Camp

Defendant proposes that the Machias Savings Account #7250 be allocated to Plaintiff without consideration of value, but requests that the court consider the rental proceeds retained by Plaintiff and not reported to the Referee as rental income when distributing property. Plaintiff responds that there was no prohibition against Plaintiff renting the camp when he was not using it and that the rents were used to reduce his personal line of credit. Plaintiff responds that his rental income has not harmed Defendant and that she could have done the same with the property at 60 Beech Hill Road if she wished. The court agrees with Plaintiff on this issue—each party has had the right to use or rent out the property that the parties agreed each could use, and rental income is simply a substitute for the value of use of a property.

23

Accordingly, the court declines to consider the rental proceeds at issue. Thus, the court allocates the Machias Savings Account #7250 to Plaintiff without factoring its value into the overall allocation.

H. Sheryl Rentals and Harper Rentals

Each party has operated rental properties, maintained accounts relating to the properties, and received rental income. Defendant has managed Sheryl Rentals, which is responsible for managing the Tremont Properties and the house at 252 Seawall Road. Sheryl Rentals has a checking account with The First #3057 that has a balance of $2,708, as of February 29, 2016. Plaintiff manages Harper Rentals and is responsible for renting out the warehouses at 250 Seawall Road. Harper Rentals has a checking account with The First #9043, with a balance of $6,857 as of February 29, 2016.

Each party uses the funds in their respective accounts to pay the mortgages encumbering the properties they manage. Defendant asserts that because the balances in these accounts vary constantly, depending on the expenses of the respective properties and rents collected, they should be allocated to the party responsible for the account without consideration of their value.

Plaintiff further responds that NES is obligated to pay Harper Rentals back rent and maintains that Harper Rentals, not NES, paid the NES mortgage until it was paid off in 2012 and that Harper Rentals has always billed NES for the rent. However, the court concludes that NES does not owe any money to Harper Rentals because NES paid for the mortgage on the 126 Clark Road property until it was paid off.

Here, the court allocates The First Checking Account #3057—valued at $2,708— associated with Sheryl Rentals to Defendant. Similarly, the court allocates The First Checking Account #9043—valued at $6857—associated with Harper Rentals to Plaintiff. Because both

24

accounts are considered operating accounts rather than assets, they are considered for purposes of equitable distribution.

I. Cardente Request

On May 26, 2016, the court received a letter from Michael Cardente on behalf of Cardente Real Estate in which he request the court to consider granting him compensation for Cardente Real Estate's efforts in connection with the sale of the Wharf property. The letter was not properly authenticated or introduced as evidence. Therefore, the court will not consider the contents of the letter, or otherwise address Cardente's request. However, the Referee is free, in his discretion, to list the Wharf property again with Cardente Real Estate.

XI. *Money Allegedly Owed Under the First Interim Order*

Defendant asserts that Plaintiff owes her $2,733.01 for her payment of the insurance premium on the Sullivan Camp and Plaintiff's failure to pay health insurance premiums under the April 1, 2014 First Interim Order. Defendant alleges that the First Interim Order obligated Plaintiff to pay the homeowners insurance on the Sullivan Camp, but Plaintiff told his bookkeeper not to pay and instead sent the bill to Defendant. Defendant asserts that she paid the bill mistakenly thinking it was her obligation only to learn that it was for the Sullivan Camp and Plaintiff's responsibility. The exhibit Defendant cites to in support of this argument only shows an insurance bill with a minimum due of $375.50. Def. Ex. 126. Defendant further asserts that Plaintiff underpaid Defendant's insurance premiums for eleven months until the February 27, 2015 order made each party responsible for his or her own health insurance costs. In support Defendant points to an exhibit showing an alleged underpayment of $55.95 on April 16, 2014 and again on April 30, 2014. The alleged $55.95 underpayment twice a month for eleven months adds up to $1,230.90. She also asserts that Plaintiff only paid Defendant $8,257.94 of the $10,000 due to her for the first payment covering reasonable expenses under

25

the First Interim Order. In support Defendant points to a check for $8,257.94 to Plaintiff from April 10, 2014. Writing on the exhibit, however, notes that an additional $1,500 was received in March or April and that Plaintiff was only $242.06 short of the requisite payment. In sum, Defendant requests Plaintiff reimburse her $2,733.01 for the Sullivan Camp insurance premium and for monies due pursuant to the First Interim Order.

Here, the evidence presented in support of Defendant's argument only indicates that Plaintiff underpaid her by $729.46. Within 60 days, Plaintiff will reimburse Defendant that amount, which is not shown in the allocation of marital property attached to this Final Divorce Judgment.

## XII. Defendant's Request to Reconsider the First Interim Order

Defendant requests the court reconsider the April 1, 2014 First Interim Order to the extent it addresses responsibility for business insurance. Specifically, Defendant requests that Plaintiff reimburse her $7,500 for funds she expended purchasing duplicative insurance coverage for Ruby Red, Inc. and the Tremont Properties. Defendant explains that during the course of the parties' marriage, all vehicles owned by NES and all business property and liability insurance for NES and Ruby Red, Inc., as well as insurance on the Tremont Properties, Seawall Road and 126 Clark Road, were consolidated in a package insurance policy issued by Hanover Insurance Company. On December 12, 2013, the agent for the insurance company informed Hanover that the parties were going through a divorce and wished to separate NES and Ruby Red, Inc. coverage into two separate policies at renewal. Thereafter, Plaintiff obtained insurance coverage for NES and informed Defendant, just prior to the expiration of the policy, that it was up to her to find insurance for Ruby Red, Inc., the Tremont Properties, and her automobiles. Defendant asserts that because the Tremont Properties and McKinley

26

Market were the least favorable risks, she was only able to obtain surplus coverage for Ruby Red, Inc. and the Tremont Properties. The cost of this insurance to Defendant was $7,500. Plaintiff does not specifically respond to this argument, but generally denies any charges of economic misconduct or wrongdoing.

In the First Interim Order, the District Court addressed Defendant's $7,500 payment for the first three months of replacement coverage by requiring Plaintiff to pay the next three months of insurance premiums. This was a fair result and the court denies Defendant's request to revisit the issue.

### XIII.    Petition for Distribution of Funds to Pay 2015 Income Taxes

Plaintiff petitioned the court for a distribution of funds to pay individual 2015 state and federal income taxes. When Plaintiff filed his motion, he presented the court with a letter from his accountant providing an estimate of his tax liability. Now, Plaintiff seeks an award of $183,458 for taxes.

Defendant asserts that the draft tax return Plaintiff submitted at trial estimates his tax liability without considering any losses that may be posted by NES. To complicate matters, Plaintiff has allegedly refused to prepare a tax return for NES. Defendant asserts that NES's tax return is necessary to definitely establish Plaintiff's 2015 tax liability.

Defendant further explains that income from Dictator, Inc. is the primary basis for Plaintiff's 2015 income tax estimate, but at no point during 2015 did Plaintiff make quarterly payments toward his tax liability or request permission from the Referee to reserve funds for income taxes. Defendant further asserts that Plaintiff refused to file a joint extension with Defendant because he had issued a 2014 1099-MISC to Defendant for $83,780.34 from Dictator, Inc. and a W-2 for $3,434.12 from NES.

27

Defendant acknowledges that she has received the benefit of income from Dictator, Inc. and, for 2015, her share was $152,744.00. Since Plaintiff's draft return indicates his combined tax rate for 2015 state and federal taxes is 38.5%, the tax on Defendant's court ordered payments would be $58,806.00. Defendant requests the court take this amount into consideration in fashioning the equitable division of marital property and allocate the responsibility for 2015 state and federal income taxes in Plaintiff's name to Plaintiff.

This Final Divorce Judgment imputes substantial income from Dictator, Inc. and NES to Plaintiff. Given that fact and the fact that Plaintiff has incurred taxes on income that went to the benefit of both parties, any and all taxes, penalties and interest incurred by Plaintiff as a result of his ownership interest in Dictator, Inc. shall be borne equally by the parties. Also, any capital gains tax or other tax (including transfer tax, if any) triggered by the sale of the assets of Dictator, Inc. will be borne equally by the parties. However, unless the parties stipulate otherwise in writing, no distribution to make the tax-related payments will be ordered. Instead, the taxes will be paid from the proceeds of the sale of the assets of Dictator, Inc. If Plaintiff proves he has already made payments toward his tax liability, Defendant will reimburse him for half of what he has paid.

### XIV. Spousal Support

The issue of spousal support arises primarily in the context of Defendant's request that she be awarded spousal support if Plaintiff is awarded Dictator, Inc. Because this Final Divorce Judgment requires the sale of the assets of Dictator, Inc., that basis for spousal support does not apply.

However, Defendant further asserts that she is entitled to spousal support because Plaintiff's management of the businesses owned by the parties has greatly impacted the parties' entitlement to Social Security. Specifically, she asserts that Plaintiff will be entitled to $2,223

28

per month at his full retirement age—or $3,054 if he waits until age 70, while Defendant is only entitled to $1,222 per month at full retirement age—or $1,565 per month if she waits until age 70.

Plaintiff asserts that the parties' age, earning history, and earning capacity are approximately equal, that each will likely be allocated sufficient assets to support themselves in the lifestyle to which they are accustomed, and that neither party should pay spousal support to the other.

An order granting, denying, or modifying spousal support must state:

A. The type or types of support, if any is awarded;
B. The method or methods of payment and the term and limitations imposed, if support is awarded;
C. If the support awarded is not, in whole or in part, subject to future modification; and
D. The factors relied upon by the court in arriving at the decision to award or deny spousal support, if the proceeding was contested.

19-A M.R.S.A. § 951-A(1) (2015). The factors the court must consider when determining an award of spousal support are:

A. The length of the marriage;
B. The ability of each party to pay;
C. The age of each party;
D. The employment history and employment potential of each party;
E. The income history and income potential of each party;
F. The education and training of each party;
G. The provisions for retirement and health insurance benefits of each party;
H. The tax consequences of the division of marital property, including the tax consequences of the sale of the marital home, if applicable;
I. The health and disabilities of each party;
J. The tax consequences of a spousal support award;
K. The contributions of either party as homemaker;
L. The contributions of either party to the education or earning potential of the other party;
M. Economic misconduct by either party resulting in the diminution of marital property or income;
N. The standard of living of the parties during the marriage;
O. The ability of the party seeking support to become self-supporting within a reasonable period of time;
P. The effect of the following on a party's need for spousal support or a party's ability to pay spousal support:

29

1) Actual or potential income from marital or non-marital property awarded or set apart to each party as part of the court's distributive order pursuant to section 953; and

2) Child support for the support of a minor child or children of the marriage pursuant to chapter 63; and

Q. Any other factors the court considers appropriate.

19-A M.R.S.A. § 951-A(5). The types of spousal support the court may award include: A) general support to provide financial assistance to a spouse with substantially less income potential than the other spouse so that both spouses can maintain a reasonable standard of living; B) transactional support designed to provide for a spouse's transitional needs; C) reimbursement support to achieve an equitable result in the overall dissolution of the parties' financial relationship in response to exceptional circumstances such as economic misconduct, or substantial contributions by one spouse towards the educational or occupational advancement of the other during the marriage; and D) nominal support to preserve the court's authority to grant spousal support in the future. 19-A M.R.S.A. § 951-A(2). The court's order must state the method or methods of payment that the court determines just including, but not limited to lump-sum and installment payments. 19-A M.R.S.A. § 951-A(3). The award must also state the term of and any limitations on the award that the court determines just. *Id.*

Based on the allocation of the parties' assets and property, the court finds and concludes that no award of spousal support is necessary or appropriate, even though Plaintiff's Social Security entitlement will be greater than Defendant's. Both parties will have ample assets and neither has shown a justification for an award of spousal support, in light of the overall allocation of the parties' assets, liabilities and property. Any disparity in the parties' expectancies regarding Social Security is adequately addressed in the allocation of assets and property.

*XV.    Economic Misconduct and Imputed Income*

The issue of economic misconduct enters the case mainly as a result of Defendant's accusations against the Plaintiff, although the Plaintiff makes accusations as well.

Plaintiff asserts that Defendant mismanaged McKinley Market and NES and that she took $200,000 from a safe deposit box. Although there is some merit to the mismanagement issue, particularly as to McKinley Market, it does not rise to the level of economic misconduct. Defendant did appropriate about $30,000 in income from Ruby Red, Inc. for her own benefit and the attached allocation table at page 4 treats her as having received that income. As to the $200,000 that had been in the safe deposit box, as noted elsewhere herein, it appears to have been utilized for the parties' common benefit years ago rather than misappropriated for Defendant's own benefit.

Defendant's allegations of misconduct fall into three areas, two of which the court finds meritorious. First, she claims that Defendant charged numerous personal expenses to various businesses. In fact, both parties have charged personal expenses to the various businesses, so some of the Defendant's allegations, while valid, apply as much to her as to the Plaintiff. This area of Defendant's claim of economic misconduct does not justify any particular award or other adjustment to the allocation of the parties' property and assets.

However, Defendant's allegations with respect to Dictator, Inc. and NES were in fact proven. Defendant's evidence established that Plaintiff improperly used substantial corporate funds from NES for his personal benefit while he was managing the business and committed economic misconduct by not reporting cash received from retail lobster sales between 2007 and 2015. More specifically, Defendant showed that Plaintiff used two separate bookkeeping systems at NES, one that Plaintiff controlled and used, and one that was handled by his bookkeeper. Despite the existence of these two systems, Plaintiff has refused to provide records

31

from the system that he personally maintained. In addition, Plaintiff caused NES to stop accepting credit cards for the retail sale of lobsters and then utilized this change to retain cash received from lobster sales without recording it as corporate income. In 2012, Plaintiff stopped NES from selling lobsters except to two customers, causing the income NES derived from lobster sales to fall dramatically.

Defendant's proposed findings of fact and conclusions of law spell out the details of Plaintiff's mismanagement and misconduct regarding NES in compelling detail. The court adopts and incorporates by reference Defendant's recitation of this aspect of the evidence. *See* Defendant's Proposed Judgment, Finding[s] of Fact And Conclusions of Law at 28-33.

In addition, the evidence clearly establishes that, while he was managing NES, the Plaintiff took out two lines of credit, the balance of which totals nearly $350,000. Before Plaintiff took over, NES had only limited debt and had substantial cash

Similarly, Defendant has proved economic misconduct on the part of Plaintiff with respect to Dictator, Inc. The court adopts the following as its findings from the Defendant's proposed findings:

In 2012, Mr. Harper used of Dictator, Inc. funds for motorcycle repairs by Lewis Boyle in the amount of $6,000, Def. Exh. 104, pg. 6; one payment to Lamont Rice for $4,000 and one to Dana Rice for $1,500 which had no legitimate business purpose, Def. Exh. 104. pgs 8,9; an unexplained payment to Bruce Stewart in the amount of $1,200; Def. Exh. 104. pg. 18; a payment to Eric Olson of $3,100 for a camp in Rockwood, Def. Exh. 104. pg. 20; Bank of America charges for gas, travel, hotels and personal radio for Pandora and Sirius radio. Def. Exh. 104. pgs. 2,3,6,10,12,16,17,18; and payment of his personal Capital One credit card from Dictator, Inc. Def. Exh. 104, pg. 5. He also took a year-end bonus by payment to the payroll account of $200,000. Def. Exh. 104. pg. 20;

In 2013, for the entire year the divorce was pending and Mr. Harper was subject to the preliminary injunction prohibiting use of funds except for in the ordinary course of business, he used funds generated by Dictator, Inc.. for his own personal benefit without the knowledge or consent of Sheryl W. Harper. Dictator's 2013 Expense Report (Def. Exh. 112) reveals he made a payment for rent of a camp from Eric E. Olson, Jr. in Rockwood for $3,100; made payment to Jackman Power Sports $584 for work on his snowmobiles; made payment to Lewis Boyle $3,000 for motorcycle work; paid River Valley $10,924 for new snowmobile and $350 for a snowmobile warranty; paid his divorce lawyers, Taylor, McCormick & Frame $7,500; paid two payments of

32

$4,030 and $3,700 to TMR as a donation to the Iron Dog Snowmobile Run in Alaska; and paid the Town of Jackman $751 for his snowmobile registration. At year end, Mr. Harper transferred $150,000 to the payroll account to pay himself a bonus. Def. Exh. 104, pg. 41.

In 2013, Mr. Harper also expended $20,980 on the corporate credit card. Def. Exh. 112. Charges on the Bank of America credit card ending 0852 and 6246 far exceeded the $6,088.39 Bank of America charges in 2012 (Def. Exh. 104, pgs. 2,3,6,10,12,16,17,18) and the $5,047.02 Bank of America charges in 2015. Def. Exh. 111A. In 2013, Mr. Harper did not make a single trip down to Fairhaven, Massachusetts to the boat between January, 2013 and his deposition in mid-October, 2013.

In 2014, Mr. Harper continued his use of Dictator, Inc. corporate funds for his personal benefit, despite the court's order. He paid his experts Dawson, Smith, Purvis & Bassett $7,000, donated $200 to his girlfriend's charity, Literacy Volunteers, paid Richard Nauzerolle $3,785, for a reason Mr. Harper could not remember, and paid $7,000 to Nicholasville Toyota for his daughter's car. Def. Exh. 111, Def. Exh. 105, and Def. Exh. 105B.

Further, in 2014, Mr. Harper paid himself in February, 2014, at a time when he had shut down the joint household account, and closed the only credit card Sheryl E. Harper had prior to his snowmobiling trip to Alaska and Sheryl had no access to any income. Def. Exh. 111A, pg. 3; Def. Exh. 105, pgs 18, 19 of 22. Upon return from his vacation, he paid himself another $8,500 on March 24, 2014. Def. Exh. 105, pg. 17 of 22.

In 2015, Mr. Harper's operation of Dictator, Inc. was subject to this Court's Amended Interim Order, dated February 27, 2016, and was under the oversight of the Referee. During that year, gross receipts increased over $500,000 over 2014. *See* Def. Exh. 112A compared to Def. Exh. 111. Even though the Referee was monitoring account activity, Mr. Harper paid $20,800 towards a camper out of Dictator funds on July 15, 2016, (Def. Exh. 105A); managed to pay all auto expenses for his personal use of his Ford truck out of Dictator, Inc. (Def. Exh. 112B), and purchased a brand new 2016 Ford F350 truck and incurred a new truck loan 10 days after the November 2, 2015, scheduled hearing. Def. Exh. 112D, Def. Exh. 105A. This occurred at a time when Mr. Harper reported to the Referee he needed to draw cash from Dictator's credit line and therefore could not transfer money to the Referee account. Joint Exh. 48E.

Defendant's Proposed Judgment, Finding[s] of Fact and Conclusions of Law at 26-27.

Plaintiff challenges Defendant's allegations of misconduct asserting that they are not supported by reliable evidence, ignore the fact that both parties aggressively characterized expenses as business expenses, and ignore the reality that Plaintiff was required to continue operating NES while divorce proceedings were under way even though he expressed no interest in doing so. Furthermore, Plaintiff responds that it was Defendant, not he, who

33

exercised bad faith during the transition of NES as supported by the trial testimony of Mike Smith.

The court has weighed the evidence and finds and concludes that Defendant has proved clearly and convincingly, i.e. that it is highly probable, that Plaintiff has engaged in economic misconduct to the extent of taking at least $800,000 from what should have been shared income from NES and Dictator, Inc., of which Defendant's presumptive half-share would have been about $400,000. The $800,000 figure reflects what the court finds to be substantiated in largely undisputed transactions.

In some respects, whether Plaintiff is in fact guilty of economic misconduct may be beside the point—the salient point is that the evidence shows that he appropriated for his own benefit a marital asset in the form of income from the Dictator and NES businesses, just as Defendant used $30,000 from the income from Ruby Red, Inc. for her own purposes. The attached table of allocated marital property imputes these amounts as income to each of the parties.

In addition, Defendant demonstrated that the Plaintiff opened and drew down the two lines of credit, with The First and Machias Savings Bank, relating to the Wharf property, and has not explained what happened to most of the amounts drawn on the lines. Based on the extensive evidence regarding Plaintiff's economic misconduct with respect to NES, this Final Divorce Judgment allocates responsibility for paying The First line of credit solely to the Plaintiff, and requires that the line be paid off either by him or from his share of the proceeds of the sale of the Wharf property and the assets of NES. The Machias Savings Bank line of credit will be treated as a joint obligation.

Plaintiff's post-trial motion asserts, among other things, that Defendant was required to trace the funds that Plaintiff took out of the businesses into the hands of third parties, which

34

admittedly Defendant has not done as to most of the funds. She has shown that the Plaintiff made a number of purchases during the divorce proceeding and to that extent has traced funds. But Plaintiff's premises that a party seeking to impute the receipt of marital funds must follow the funds into the hands of third parties is not the law, as the court understands it. What Defendant had to show is that the Plaintiff more likely than not obtained funds from the parties' businesses that he has not accounted for in this case, and that she has done. Admittedly, her evidence is largely circumstantial, and it rests in part on the adverse inferences that can be brought from the Plaintiff's decision to dispense with a payment method that can be readily tracked and go to a cash payment system, coupled with his use of two bookkeeping systems for the lobster businesses, one of which the Defendant and the referee did not have access to. These and other facts are sufficient to persuade the court to impute to Plaintiff the receipt of $800,000 in marital funds for which he has not accounted.

*XVI.    Attorney Fees*

Plaintiff requests that each party be individually responsible for his or her attorney fees.

In addition to her claims of economic misconduct, Defendant asserts that Plaintiff should pay Defendant $15,000 to make up for the additional amount he received, pursuant to court order, for attorney fees from marital funds. Defendant further asserts that Plaintiff's actions have increased the cost of litigation, delayed final resolution, and should be calculated into the court's equitable division of assets and allocation of debt. For example, Defendant contends she was forced to file a motion to enforce a $10,000.00 payment due to her under the April 1, 2014 First Interim Order. She contends that Plaintiff claimed he did not have sufficient funds to pay Defendant, but purchased a new snowmobile on November 26, 2014. Up to a point, the record confirms Defendant's position. Only after an in-chambers conference did Plaintiff make the payments owed to Defendant.

35

In addition, Defendant claims that Plaintiff failed to inform the court of the funds he made during a January, 2015 fishing trip or that he had deposited $60,000 into his personal account to pay his lawyers and experts. Defendant asks the court to consider this conduct in its allocation of attorney fees.

The court may order a party to pay another party's reasonable attorney fees, including costs, for participation in the proceedings. 19-A M.R.S.A. § 105(1). In making this determination, the court may consider the relevant financial circumstances of the parties and which party is in a better position to bear the costs of litigation, whether the conduct of a party has contributed to the duration of litigation, and any other factors that reasonably bear on the fairness and justness of the award. *Estate of Ricci*, 2003 ME 84, ¶ 30, 827 A.2d 817 (citations omitted).

Plaintiff's present and former counsel have submitted affidavits of attorney fees and costs asserting that Plaintiff incurred a total of $246,174.31[3] in attorney fees and costs—$172,238.01 in attorney fees and $21,856.72 for disbursement reimbursements to Taylor McCormick & Frame, LLC and $52,079.58 in attorney fees and costs to Susan M. Schultz, LLC. Defendant's counsel submitted an affidavit asserting that she incurred a total of $243,701.72 in attorney fees and costs.

Issues of economic misconduct are addressed above, and, although economic misconduct could in theory justify an order requiring the wrongdoer to pay the victim's attorney fees, the court does not intend to penalize the Plaintiff twice for the same misconduct. However, the court agrees with the Defendant up to a point that, even apart from economic misconduct, Plaintiff's conduct caused her to incur additional attorney fees, and also that Plaintiff's

---

[3] If the $21,856.72 for disbursement reimbursements to Taylor McCormick & Frame, LLC are not included in this calculation, the amount of attorney fees and costs is $224,317.59.

36

application of $60,000 toward his own attorney fees involved funds in which Defendant had a reasonable expectancy and interest.

Based on the entire record, the court finds and concludes that Defendant is entitled to have Plaintiff reimburse her for $50,000 of her attorney fees. Plaintiff shall pay Defendant or her attorney $50,000 from his share of the funds in the parties' accounts at the time the funds are distributed to the parties.[4]

*XVII. Just and Equitable Allocation of Assets and Property*

The attached table sets forth the court's allocation of the property and assets of the parties. Property that is to be sold and the proceeds divided is listed and valued, but is not counted in the allocation. Likewise, non-marital property, post-filing accounts and property of limited or no value is not counted in the allocation. The $800,000 in NES and Dictator, Inc. income that the Defendant proved that Plaintiff appropriated from income of NES and Dictator is imputed to him. Likewise, the $30,000 that Defendant appropriated from income of Ruby Red, Inc. is imputed to her.

The allocation does not include the proceeds of the sale of the properties to be sold, but those do not change the allocation ratio because the proceeds of sale are to be divided equally. The allocation also does not reflect the attorney fee award, because it is conceptually separate from the allocation of marital property.

Although not equal, the net values of marital assets and property allocated to the parties are just and equitable. The net value allocated to Defendant is higher than that allocated to Plaintiff only because the value allocated to her includes 70% of the marital component of the - 3108 account to reflect her substantial contribution of $492,669 in non-marital funds to what is now the marital component of the account. As the last entry on the attached table shows, if

---

[4] The attached table on page 4 shows the amounts previously disbursed by the Referee to the parties. Plaintiff notes that the Referee has disbursed about $24,000 more to Defendant than to him. The court has considered this point in determining the fee award.

37

the -3108 account is excluded from the allocation, the difference in values allocated is less than $2,000.

*XVIII. Transition and Sale of Properties and Disbursement of Proceeds*

Referee John Fidrych shall supervise the distribution of the bank and brokerage accounts listed in this Final Divorce Judgment and the attached table, and confirm that the various amounts awarded to each of the parties herein are subtracted from the other party's share.

Referee Fidrych is hereby authorized, but is not required, to take immediate and full control of Dictator, Inc., Ruby Red, Inc., the Tremont properties and the Wharf properties and all assets and accounts associated with those properties. The parties are hereby ordered and enjoined to cooperate fully with the Referee in all respects, including turning over any and all books, records and other items requested by the Referee.

Any income available for distribution to the parties from any of the businesses, after payment of all expenses and fees of the Referee, shall be shared equally between them.

The Referee shall sell, in any commercially reasonable manner, including by auction, any and all right, title and of interest of either or both parties in the following:

- the fishing vessel Dictator and its licenses and permits, and all other assets of Dictator, Inc.

- the so-called Wharf property and all assets of Northeastern Seafood, Inc.

- the Tremont properties (including McKinley Market) and all assets of Ruby Red, Inc.

Unless the parties agree otherwise in writing, the sale of the Tremont properties shall be by auction, given the limited interest in the listing of those properties. The sale of the other properties may be by auction, by listing or any other commercially reasonable means. The sale of these properties may include any and all equipment, fixtures, vehicles and all tangible and

intangible assets associated with any of the properties, except for any items specifically allocated to a party in this Final Divorce Judgment or the attached chart.

This Final Divorce Judgment assumes that the sale of the properties will be of assets rather than sale of the stock of the corporate entities owned by the parties, but a sale of stock may occur instead if deemed more financially advantageous to the parties than a sale of corporate assets. Assuming all assets of Dictator, Inc., Ruby Red, Inc. and Northeastern Seafood, Inc. are sold and all debts are paid, the parties shall cause those corporations to be dissolved.

The Referee is authorized to retain, on any commercially reasonable terms, the services of any broker, consultant, property manager or other service provider to protect the properties and prepare and list them for sale. Any commission or other compensation, or expense or reimbursement due to the Referee, or to any broker, consultant, property manager or other service provider shall be paid through the Referee's account.

If any property is listed for sale and no purchase and sale agreement is signed within the first three months, the listing price for that property shall be reduced by five percent per month thereafter, unless the Referee expressly determines otherwise or the parties agree otherwise in writing.

The Referee is authorized to fund his fees and any costs or expenses associated with his activities by withholding equal amounts from each party's share of any account or sales proceeds, in a total amount sufficient to fund the Referee's fees and any costs or expenses.

The Referee shall assure that the parties, directly or through counsel, are informed of material developments and the terms of all listings, offers and other aspects of the sale process.

The Referee shall deposit the proceeds of any sale, net of closing costs, into the Referee's account. From the account, the Referee is authorized to satisfy his fee as well as any

39

and all outstanding costs, commissions and expenses associated with the sale of any property. All taxes and expenses associated with the sale of property shall be considered a joint expense to the parties.

The parties are hereby ordered and enjoined to cooperate in all transactions, including but not limited to, the listing and sale of properties, and to execute any documents associated with any transaction. If either party fails or refuses to execute any document or engage in any transaction in the course of the sale of a business or any other aspect of this Final Divorce Judgment, the Referee may apply to the court for authority to act on behalf of that party. *See* M.R. Civ. P. 70 (after notice and opportunity for hearing, court may appoint another person to execute documents and act on behalf of a party who refuses or fails to execute documents or act).

### XIX. *Referee's Authority Pending Sale or Any Appeal*

The Referee is hereby authorized to take possession and control of any asset (including all books and records, permits and accounts) of the parties and to operate it pending sale or during the pendency of any appeal of this judgment.

To assure that the parties' assets are preserved, the Referee is authorized to transfer funds from the so-called Fish Unlimited account (ending in -4103) of the parties into the Referee's account and to use such funds (1) to defray any expense associated with any marital asset of the parties, if non-payment of the expense could potentially cause a partial or complete loss of the property, and (2) to pay the parties' attorney fees to the extent agreed on by the parties.

### *Conclusion*

IT IS ORDERED AND ADJUDGED AS FOLLOWS:

1. The court has previously granted a divorce by means of the Order and Judgment Granting Divorce dated February 26, 2015.

2. The parties' assets and property are allocated as set forth herein and on the attached table, which is hereby incorporated by reference.

3. Any property of the parties not allocated herein or in the attached table is awarded to the party in possession of tangible property or the party in whose name intangible property is titled.

4. Defendant's Motion to Enforce the November 3, 2015 Order is granted in part, to the extent set forth herein, and is otherwise denied. Plaintiff's Motion to Strike the affidavit of Michael Cardente is granted to the extent set forth herein and is otherwise denied.

5. Defendant is awarded $50,000 against Plaintiff toward her attorney fees and costs in this case. Any costs or expense associated with this case, or with the sale of properties to third parties, including fees and expenses of the Referee, shall be allocated equally between the parties, except that any costs or expenses, including fees and expenses of the Referee, associated with the transfer of property awarded to only one party shall be borne solely by that party.

6. Each party is awarded sole responsibility for any indebtedness associated with the property and assets awarded to that party, and shall hold harmless and indemnify the other party against any and all claims, costs or liability associated with the debt, including costs of defense and attorney fees incurred as a result of any such claim, cost or liability.

7. Any loan or indebtedness as to which the parties are jointly liable shall be refinanced or discharged within 120 days by the party to whom the property encumbered by the loan or indebtedness is awarded, so as to eliminate the liability of the other party. This paragraph applies only to property awarded to only one party, and not to property to be sold by the Referee.

41

8. The parties are hereby ordered and enjoined to cooperate with each other and with the Referee in implementing the transactions contemplated in this Final Divorce Judgment and executing any documents associated with such transactions.

9. The court invites counsel to prepare and submit an abstract of this Final Divorce Judgment for recording if necessary.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Final Divorce Judgment by reference in the docket.

Dated: November 21, 2016

_____
A.M. Horton
Justice, Business & Consumer Court

Entered on the Docket: 11-21-16
Copies sent via Mail __ Electronically ✓

HARPER V. HARPER, BCD FM-14-02

THE FOLLOWING TABLE IS ATTACHED TO AND INCORPORATED BY REFERENCE IN THE AMENDED JUDGMENT ISSUED IN THIS CASE. IT REFLECTS THE ALLOCATION AND VALUATION OF THE PARTIES' ASSETS, DEBTS AND PROPERTY.
Where XXXX is shown in the column below a party, the asset or debt is assigned to the party, in whole or part, without the value being included in the total allocation. For example, the value of properties to be sold rather than allocated is not factored into the total value of property allocated to a party. Similarly, property or accounts to be divided equally is not included in either party's column.

| MARITAL ASSET OR ITEM | VALUE/DEBT | Plaintiff | Defendant | |
|---|---|---|---|---|
| **REAL ESTATE & BUSINESSES** | | | | |
| **Tremont Property** | | | | All Tremont properties are to be sold by the Referee. |
| 42 Tremont Road: McKinley Market  .61 | 400,000 | XXXX | XXXX | All debt, taxes and other expenses associated with any of |
| 44 Tremont Road: Warehouses/Garage | 400,000 | | | the properties are to be paid from the proceeds of sale |
| 52 Harbor Drive:  Duplex (residential) .3: | 180,000 | | | and the remainder to be allocated 50/50 to the parties. |
| 21 Harbor Drive: House .74 a | 198,000 | | | |
| The FIRST (5119) mortgage | -752,800 | | | |
| **RUBY RED, INC** | 140,000 | XXXX | XXXX | Sale of all corporate assets to be arranged by Referee. |
| Equipment and Inventory | | | | Any balance to be used to pay accounts payable, debts, |
| The First Checking (5226) | 1,727 | | | expenses, taxes, etc. with remainder allocated to |
| The First ODP loan (5226) | -30,000 | | | the parties equally, except that $15,000 will be added to |
| | | | | Plaintiff's share from Defendant's share.  See section VI of the |
| | | | | Amended Judgment. |
| | | | | Assuming all assets sold, stock awarded to Defendant at no val |
| **SHERYL RENTALS** | | | | |
| Sheryl Rentals The FIRST (3057) checking | | | | Account to be used for Tremont properties pending |
| | 2,708 | XXXX | XXXX | sale.  Any balance left after sale to be included in |
| | | | | net proceeds for purposes of 50/50 allocation. |
| **250 Seawall Road** | | | | All Seawall properties and debt allocated to Plaintiff at the valu |
| House (residential) and .69 ac. | 115,000 | | | |
| Two Warehouses and .93 ac. | 438,000 | | | |
| Surplus land 9.879 ac. | 175,000 | | | |
| The FIRST (1472) mortgage | -190,840 | | | |
| | 537,160 | 537,160 | | |

| ASSET OR ITEM | VALUE/DEBT | Plaintiff | Defendant | |
|---|---|---|---|---|
| **HARPER RENTALS** | | | | |
| Harper Rentals The FIRST (9043) checkin | 6,857 | XXXX | | Operating account for Seawall properties allocated to Plaintiff. Value not counted for purposes of overall allocation because it is an operating account. |
| **126 Clark Point Road (Dock)** | 1,600,000 | XXXX | XXXX | Wharf property to be sold by the Referee. |
| Real Estate, Vehicles, Equipment | | | | All debt, taxes, and costs to be paid first. |
| | | | | remainder to be allocated 50/50 to the parties. |
| **NORTHEASTERN SEAFOOD, INC** | | | | |
| Accounts | | | | |
| The FIRST (0386) Checking | 22,490 | | | These are current NES operating accounts. Defendant can use |
| The FIRST (0394) Payroll | 527 | | | until NES sale. Any balances after sale are awarded to |
| BHBT (7043) Checking | 2,667 | | | the parties equally, so accounts are not factored into allocatior ‹ |
| Machias Savings (5590) | 10,000 | 10,000 | | Account opened by Plaintiff allocated to him at value shown. |
| The FIRST LOC (1738) | -248,787 | -248,787 | | Line of credit to be paid from Plaintiff's share of sale proceeds. |
| Machias Savings LOC (3745) | -96,973 | XXXX | XXXX | Line of credit to be paid from both parties' sale proceeds. |
| | | | | NES corporation to be dissolved assuming |
| **OTHER REAL ESTATE** | | | | all corporate assets are sold. |
| 12 Maple Lane House/Apartments | 400,000 | | 400,000 | |
| **60 Beech Hill Road Defendant residence** | 915,000 | | | |
| The FIRST (4024) | -247,659 | | | |
| The FIRST (8724) | -22,999 | | | |
| Net Value | 644,342 | | 644,342 | |
| **Trenton/Ellsworth raw land 430.15 a** | 281,000 | | 281,000 | |
| **80 Mountain View camp 1.1 a** | 278,000 | 278,000 | | |
| **Mountain View lot 1.9 a** | 115,000 | 115,000 | | |

| ASSET OR ITEM | VALUE/DEBT | Plaintiff | Defendant | |
|---|---|---|---|---|
| **DICTATOR, INC** | | | | |
| Vessel & Federal Permit | 4,500,000 | | | All assets of Dictator, Inc. to be sold by Referee. All debt and |
| The FIRST (8249) boat loan | -317,560 | | | taxes to be paid out of sale proceeds. Net proceeds to be |
| Net value | 4,182,440 | XXXX | XXXX | divided equally between parties. |
| | | | | Net income, after payment of Referee fees and other expenses |
| | | | | is to be shared equally between the parties pending sale. |
| The FIRST checking (2028) | 44,942 | XXXX | XXXX | To be used in operations pending sale; then divided equally. |
| The FIRST LOC (3171) | -80,000 | XXXX | XXXX | Line of credit to be paid at closing of sale of Dictator assets. |
| | | | | Dictator stock to Plaintiff at no value assuming all assets sold. |
| **Recreational Vehicles, Equipment, Tools** | | | | |
| All of the 7 or 8 snowmobiles | | | 85,000 | All snowmobiles awarded to Defendant. |
| 1986 Harley FXRS Liberty | 15,615 | | 15,615 | |
| Accessories | 16,000 | | 16,000 | |
| 2010 Harley FLXH Street Glide | 15,570 | 15,570 | | |
| Accessories | 13,000 | 13,000 | | |
| 2006 Harley FLSTN1 Heritage Softail | 10,000 | | 10,000 | |
| Truck Bed 105 gallon fuel tank | 1,000 | 1,000 | | |
| Six Place covered snowmobile trailer | 12,000 | | 12,000 | Snowmobile trailers to Defendant |
| Four place covered snowmobile trailer | 4,000 | | 4,000 | with the snowmobiles |
| Motorcycle and snowmobile lift | 850 | 850 | | |
| 2011 Massey Ferguson tractor | To be sold | XXXX | XXXX | To be sold and proceeds divided equally. |
| Flatbed trailer for tractor | 8,000 | 8,000 | | |
| Power, hand tools, machinery & equipm | 50,000 | 50,000 | | |
| **Other** | | | | |
| Household furniture 60 Beech Road | | | XXXX | Furniture values assumed not to be material to value of |
| Household furniture Sullivan | | XXXX | | of each party's allocated share. |
| Plaintiff's safe deposit box funds | 36,000 | 36,000 | | |
| Other personal property (nominal value | 16,464 | 16,464 | XXXX | |
| for Plaintiff's collections of coins and cards). | | | | |
| **Investment accounts/Stock** | | | | |
| Marital value HM Payson (3108) | 760,759 | 266,266 | 494,493 | 65% of marital component to Defendant due to her contributio |
| brokerage account | | | | nonmarital funds to the marital component of this account. |
| Defendant's nonmarital Apple stock in -3108 | | | XXXX | Value of nonmarital stock not included in allocation |
| HM Payson Fish Unlimited (4103) | 543,995 | 271,998 | 271,997 | Fish Unlimited account to be divided equally |

| Item | Value | Plaintiff | Defendant | Notes |
|---|---|---|---|---|
| HM Payson Capital account (3171) | 160,049 | XXXX | XXXX | Any balance in capital account to be allocated equally. |
| HM Payson (3162) JWROS brokerage acc | unknown | XXXX | XXXX | To be equally allocated. |
| Defendant's Ameriprise Annuity | 106,854 | | 106,854 | |
| Plaintiff's AL Group #3 LP stock | 10,000 | 10,000 | | |
| | | | | |
| **Retirement accounts** | | | | |
| HM Payson (3129) Defendant SEP IRA | 65,907 | | 65,907 | |
| HM Payson (3156) Plaintiff SEP IRA | 77,538 | 77,538 | | |
| | | | | |
| **Personal accounts** | | | | |
| **Plaintiff** | | | | Post-filing personal accounts not counted in allocation |
| The First (0822) checking | 2,754 | XXXX | | |
| Machias Savings (7250) checking | 2,500 | XXXX | | |
| Camden Nat'l (4787) Health Savings | 5,312 | XXXX | | |
| Machias Savings (1165) LOC | -132,695 | XXXX | | |
| Machias Savings (7250) Overdraft | -550 | XXXX | | |
| | | | | |
| **Defendant** | | | | |
| The First (6651) Savings | 552 | | XXXX | |
| The First (2477) Checking | 10,586 | | XXXX | |
| Camden Nat'l (4957) Health Savings | 7,297 | | XXXX | |
| | | | | |
| Prior Referee Disbursements to Parties | | 194,500 | 216,800 | |
| Stipulated tax refund to Defendant | | | 25,169 | |
| | | | | |
| Amount imputed to Plaintiff for income of NES and Dictator appropriated by Plaintiff | | 800,000 | | |
| Amount imputed to Defendant for income of Ruby Red appropriated by Defendant | | | 30,000 | |
| | | | | |
| **Net value allocated to each party** | | 2,452,559 | 2,679,177 | Amounts do not include value of property to be sold. |
| | | | | |
| Net values excluding the -3108 account are almost equal | | 2,186,293 | 2,184,684 | |

STATE OF MAINE                              BUSINESS AND CONSUMER COURT
Cumberland, ss.                             Location: Portland
                                            Docket No.: BCD-FM-14-02

TIMOTHY W. HARPER,                 )
                                   )
                Plaintiff          )
                                   )
        v.                         )
                                   )
SHERYL E. HARPER,                  )
                                   )
                Defendant          )

## AMENDED DIVORCE JUDGMENT

This matter is before the court for decision following trial.

### I.      Background

Plaintiff Timothy W. Harper and Defendant Sheryl E. Harper were married in New York in July 1978. Both are presently in their late fifties. They have four adult children. During the 36 years of the marriage,[1] they started several businesses and accumulated substantial real property and other assets. With the exception of certain assets gifted to or inherited by one party or the other, all of the assets owned separately or jointly by the parties are marital assets.

The marital businesses are as follows:

- The McKinley Market, a convenience store and gas station in the Bass Harbor community in the Town of Tremont. In addition to the store, the parties' marital property includes adjacent parcels occupied by two storage buildings and

---

[1] This court issued a divorce in February 2015, on the basis of M.R. Civ. P. 115(b), authorizing the court to grant a divorce notwithstanding the pendency of other claims or counterclaims in the case.

two residential buildings. [McKinley Market and the adjacent properties are collectively sometimes referred to herein as "the Tremont properties"]. The convenience store/gas station business is owned by Ruby Red, Inc., a corporation of which Defendant is the sole shareholder. The Defendant has been responsible for managing the operation of the convenience store and the rental of the Tremont properties.

- The Dictator, a scallop fishing boat based in Massachusetts. The boat is owned by Dictator, Inc., a corporation of which Plaintiff is the sole shareholder. The Dictator, Inc. assets include permits to fish and several operating accounts. The debt associated with the Dictator includes a loan from The First as well as a line of credit. Plaintiff has always been responsible for managing the operations of Dictator, Inc., although the fishing is handled by a hired captain and crew.

- North Eastern Seafood, Inc. (NES), an incorporated seafood sales business doing business under the names of Fish Unlimited and Southwest Lobster, operating out of a wharf and storage facility located at 126 Clark Point Road, Southwest Harbor ["the Wharf property"]. Early in the parties' marriage, Defendant started the Fish Unlimited business by selling fish while Plaintiff worked on the parties' fishing boat. At some point before this case was brought, Plaintiff took over primary responsibility for managing the operations of NES, although he turned over responsibility to the Defendant toward the end of 2015. The assets associated with NES include inventory and equipment and several operating

2

accounts. Debt associated with NES consists of two lines of credit, with Machias Savings Bank and The First.

- Commercial and residential property on Seawall Road, Southwest Harbor, Maine ["the Seawall property"]. The property consists of a residence, two warehouses and a large lot of just under 10 acres. Plaintiff has been managing the Seawall property and collecting rents.

- Sheryl Rentals and Harper Rentals, two property rental businesses operated separately by Defendant and Plaintiff respectively. Each business has an operating account in the name of the party in question.

Although some of the businesses are owned by corporate entities of which one or both parties are the sole shareholders, those businesses as well as the parties' rental businesses were initiated and developed during the parties' marriage, and all of the corporate entities were formed during the parties' marriage. All of the businesses constitute marital property.

In addition to the businesses, the parties own several real properties and substantial tangible and intangible personal property, all of which are discussed below.

II.    *Procedural History*

This case has been pending for almost four years. It was filed in the Ellsworth District Court in October 2012, and was transferred to the Augusta District Court in September 2013. The Augusta District Court held hearings in this matter on December 19, 2013 and March 4, 2014. On April 1, 2014, the District Court entered its First Interim Order, awarding Defendant exclusive possession of the parties' real estate located at 60 Beech Hill Road in

3

Mount Desert, Maine, and awarding Plaintiff exclusive possession of the parties' real estate located at 68 Mountain View Road in Sullivan, Maine.

The First Interim Order further allocated between the parties responsibility for the operation of the five marital businesses. The Defendant was assigned responsibility for operating the McKinley Market business and property, as well as the Sheryl Rentals business. Plaintiff was assigned the responsibility to operate the NES seafood business; the Harper Rentals business, and the Dictator, Inc. fishing boat.

The First Interim Order also established responsibilities for payment of health insurance, automobile insurance, commercial and liability insurance, living expenses, monthly expenses, necessary repairs, and tax obligations.

In the Second Interim Order, issued on November 14, 2014, the District Court determined that the parties could each withdraw $30,000 from the NES Investment account for litigation expenses and that, if the parties agree, they could withdraw the remaining funds of approximately $8,416 from that account. The Second Interim Order further required a $25,169 tax refund be paid to Defendant and that Plaintiff pay Defendant an additional $19,357 to equalize the parties' 2013 income.

More than two years after it was filed, this action was transferred to the Business and Consumer Court in November 2014.

This court divided trial of the case into two phases. Phase I addressed the valuation of the parties' real estate, the valuation and allocation of intangible non-business personal property, the extent to which the parties' investments in accounts with H.M. Payson are

4

marital property, and issues relating to the parties' insurance coverage. All other issues were reserved for Phase II.

Phase I of the trial was conducted, in part, on January 28 and 29 of 2015. While Phase II of the trial was scheduled to begin on February 23, it—and the conclusion of Phase I—was postponed following a conference with the parties and their counsel on that day. Essentially, the postponement was the result of a change in direction agreed on by the parties, involving the sale of the Ruby Red and Wharf properties and the appointment of a referee whose duties would include overseeing the marketing and sale of the properties.

Three days later, at the Plaintiff's request, the court held a hearing and granted a final divorce judgment notwithstanding the pendency of other claims, pursuant to M.R. Civ. P. 115(b), reserving jurisdiction to decide all remaining issues and reserving all claims and defenses of the parties. The following day, February 27, 2015, the court issued an Amended Interim Order that, among other things, appointed John Fidrych, CPA, MBA, as Referee and tasked him with the sale of the Ruby Red and Wharf properties and oversight of the parties' businesses, including Dictator, Inc.

Phase I of the trial resumed on April 28, 2015 after which the court entered an Order addressing issues relating to the H.M. Payson Account numbered #3108 and determined that only the 700 shares of Apple stock in the Account were Defendant's non-marital property.

Over the next months, the Referee arranged for the Ruby Red and Wharf properties to be listed for sale through brokers, and eventually an offer was obtained on the Wharf property. Although the offer was for a price in the range of what the parties deemed the Wharf property to be worth, the Defendant essentially changed her mind about agreeing to sell the Wharf.

5

On August 12, 2015, Defendant filed a motion to amend the February 27, 2015 Interim Order seeking, amongst other things, to remove Plaintiff from management of Dictator, Inc.—a scallop fishing operation— and to place herself in charge. Plaintiff filed a cross motion to amend, and the court scheduled a hearing on these motions for November 2, 2015.

On October 20, 2015, Plaintiff's counsel moved to withdraw. On November 3, 2015, the court granted the motion to withdraw and amended the February 27, 2015 Amended Interim Order to transition operational responsibility for NES from Plaintiff to Defendant by December 1, 2015. Based on the Defendant's change of position regarding sale of the Wharf property, the court also modified the Amended Interim Order to postpone the sale of that property and to reject an outstanding offer to purchase that property. On November 16, 2015, Plaintiff's current counsel entered her appearance.

On January 7, 2016, Defendant filed a motion to enforce the court's November 3, 2015 Order alleging that Plaintiff was not cooperating in, and was actively impeding, the effective transition of control for NES to Defendant. This motion was consolidated for final hearing and remains pending. On March 7, 2015, Plaintiff filed a petition for distribution of funds to pay income taxes and his attorney fees. On March 28, 2106, this court ordered an advance of attorney fees, subject to reallocation. Plaintiff's petition for distribution of funds to pay income taxes was also consolidated for final hearing and remains pending.

On April 4 through 7 of 2016, Phase II of the trial was conducted. The court requested that the parties file their proposed findings of fact and conclusions of law by May 23, 2016, with reply memoranda marking up the other's proposed findings by June 6, 2016. As of June 6, 2016, the court took the case under advisement.

6

*III.    Governing Standards*

In a divorce action, "the court shall set apart to each spouse the spouse's property and shall divide the marital property in proportions the court considers just after considering all relevant factors." 19-A M.R.S.A. § 953(1). In doing so, the court must consider "[t]he contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker; [t]he value of the property set apart to each spouse; and [t]he economic circumstances of each spouse at the time the division of property is to become effective...." *Id.*

The statute provides for a "just" distribution, which is "not synonymous with an equal distribution...." *Warren*, 2005 ME 9, ¶ 45, 866 A.2d 97. Courts are not required to divide marital property equally, but are instead required to make the division fair and just considering all of the circumstances of the parties. *Id.* (quoting *Murphy v. Murphy*, 2003 ME 17, ¶ 27, 816 A.2d 814. Thus, the court may consider if one party's contributions to a marital asset were greater than the other party's in allocating marital property. *Bond v. Bond*, 2011 ME 54, ¶ 17, 17 A.3d 1219.

Furthermore, "the value of marital assets should be determined as of the time they are distributed without reference to possible future events." *Dubord v. Dubord*, 1997 ME 7, ¶ 12, 687 A.2d 647 (quoting *Bayley v. Bayley*, 602 A.2d 1152, 1154 (Me. 1992)). Accordingly, "[u]nless the sale of assets is ordered by the court, or a party makes clear that they intend to sell the property, future tax consequences need not be considered." *Id.* Marital debt is apportioned pursuant to the same considerations as the division of marital property. *Arey v. Arey*, 651 A.2d 351, 354 (Me. 1994).

7

Where the circumstances indicate that a spouse engaged in economic misconduct, this behavior may factor into the equitable distribution of property and the award of spousal support. *Ahern v. Ahern*, 2008 ME 1, ¶ 22, 938 A.2d 35. This issue is discussed further below in the context of specific allegations of economic misconduct.

*IV. The Question of Whether to Allocate or Sell the Three Primary Marital Businesses*

One of the larger questions in this case is whether the three primary marital businesses—the McKinley Market convenience store and related real estate; the Southwest Lobster seafood business and related real estate, and the Dictator, Inc. fishing boat and associated fishing rights—should be allocated to one party or the other, or should be sold, with the net proceeds of sale divided. Plaintiff proposes that he be allocated the Dictator, Inc. fishing boat and the associated fishing rights, and that the Defendant be allocated Ruby Red and Wharf businesses and related properties. Defendant, however, does not want to be allocated the Ruby Red and Wharf properties; she, too, would like to be awarded the Dictator, Inc. business, and in the alternative, she proposes that all three be sold and the proceeds of sale divided.

Based on the entire record, the court is in agreement that all three of the primary businesses (and related property) should be sold and the proceeds allocated, for the following reasons:

- Both parties are in their late fifties. Both have worked hard, and both are entitled to reap the financial benefits of their efforts over the course of the marriage.

- The convenience store business and the seafood business are both labor-intensive, requiring extensive time and energy to operate them. Both businesses have struggled

8

financially for various reasons. Neither party wants to be awarded either the convenience store business and the related Tremont properties or the seafood business and the related Wharf property.

- The value of Ruby Red, Inc. and the Tremont properties is difficult to assess. As noted above, these properties were listed for sale for some time, with little success. To award the properties to either party is to saddle that party with an asset of dubious value that will require large amounts of time to manage, even pending a sale.

- The real estate associated with NES, on the other hand, is marketable.

- The Dictator fishing boat is the plum asset in the parties' marital property portfolio—it generates very substantial income and requires little time and effort to manage compared to the NES and McKinley Market businesses, because the fishing is done by a hired captain and crew.

- The values attached to the parties' assets mean that, to achieve a just and equitable division, one party would have to be awarded the two businesses that neither party wants and the other party would have to be awarded the Dictator, Inc. business, which both parties want.

- Lastly, were the Plaintiff to be awarded the Dictator, Inc. stock outright, a just and equitable allocation would require that he pay substantial spousal support for a substantial period of time. Perhaps in recognition of that potential, Mr. Harper expressed a clear preference for an allocation that permitted the parties to move into the future without any continuing financial connection. Selling all three of the primary

businesses enables the court to make a just and equitable allocation of the parties' marital property without an award of spousal support.

In light of these factors, this Judgment provides for the three businesses to be sold under the supervision of the Referee, unless the parties stipulate in writing to some other procedure for sale or disposition of the properties.

Moreover, this Judgment provides for the sales of properties to be conducted under the supervision of the Referee, unless the parties stipulate in writing to a different procedure. The court recognizes that the Referee's involvement will be an added expense, but the history of this case, the extent of contested issues and the magnitude of the litigation effort all argue strongly against leaving it to the parties to decide how to sell the assets in question. If the parties come up with a joint detailed alternative and seek to modify this Amended Judgment accordingly, the court will certainly consider it.

### V.    *Stipulated Allocations*

The parties have reached a number of stipulations as to the allocation of certain properties, mortgage debts, and accounts. These stipulated allocations are reflected in the table attached to this decision. below. The reasonable preferences of the parties should be considered when dividing marital property. *See Norton v. Norton*, 443 A.2d 75, 76 (Me. 1982). The court concurs with the parties' stipulated allocations as set forth in the attached table and orders the assets and liabilities in question so divided.

While Defendant stipulates to the allocation and valuations, she requests that the court take into consideration each party's contribution to the acquisition of their marital real estate. *See Bond v. Bond*, 2011 ME 54, ¶ 17, 17 A.3d 1219. The court has done so, and finds that the

10

parties have contributed equally, meaning that no adjustment to the stipulated values is necessary or appropriate.

*VI.    The Tremont Properties and Ruby Red, Inc. d/b/a McKinley Market*

Neither Plaintiff nor Defendant wishes to retain possession of the so-called Tremont Properties which consist of real estate located at: 1) 42 Tremont Road—Market and Gas Station; 2) 44 Tremont Road—2 warehouses; 3) 52 Tremont Road—Residential Duplex; and 4) 21 Harbor Drive—Single Family Residence.  Similarly, neither party seeks to retain ownership of the S-Corporation, Ruby Red, Inc., which operates the McKinley Market located at 42 Tremont Road.  The Tremont Properties were purchased in 2007 based on the advice of the parties' accountant to obtain a property that could generate tax losses to offset the income anticipated from Dictator, Inc.  Prior to 2012, Plaintiff and Defendant each owned 50% of the stock in Ruby Red, Inc.   In 2012, Plaintiff transferred his 50% share to Defendant, apparently without her knowledge.

Under the supervision of Referee Fidrych, the Tremont Properties were listed for sale in 2015 with a call for offers.  The only offer received was for a portion of the property—a "green building" garage and it was not accepted.  The Tremont Properties were re-listed at some point after February 22, 2016, but have yet to attract any offers.  The parties agree that Ruby Red, Inc. owes $1,727 under The First Checking Account #5226 and $30,000 under The First Overdraft #5226.  They also agree that Ruby Red, Inc. has assets of $527 in The First Payroll Account #0394 and that the Tremont Properties are encumbered by a mortgage from The First in the amount of $752,800.  The parties dispute, however, the value of the Tremont Properties and the value of Ruby Red, Inc.'s remaining business assets and liabilities.

11

Defendant proposes that the Tremont Properties and all assets owned by Ruby Red, Inc. be sold in a commercially reasonable manner. She proposes that the gains or losses realized through the sell be split evenly between herself and Plaintiff. Plaintiff proposes that the Tremont Properties and Ruby Red, Inc. be distributed to Defendant as she is the 100% shareholder of Ruby Red, Inc. and has historically controlled the properties.

For the reasons presented in section IV, *supra*, the court determines that the Tremont Properties and the assets of Ruby Red, Inc. shall be sold off in a commercially reasonable manner and that the proceeds of sale (net of applicable commissions and closing costs) shall be divided between the parties. This is because neither party wishes to retain the assets and the evidence indicates that the Tremont Properties and Ruby Red, Inc. were purchased by the parties as a means to obtain tax benefits. Given that the properties and the corporation were obtained with the best interests of both parties in mind, given that the parties disagree over the value of the Tremont properties, and given that neither party wants the properties or assets, an sell in which the gains or losses are split is a just result.

Because the Tremont properties and the assets of Ruby Red, Inc. are to be sold, their actual value need not be established for purposes of an equitable allocation although it is relevant to whether there is a need for spousal support and also relevant to the sale of the properties. Based on the absence of offers on the real estate and based on the historical performance of the convenience store/gas station, values lower than those established by the parties' appraiser, Webersinn Appraisal, Inc., are appropriate. For purposes of determining the need for spousal support to either party only, the court adopts a value of $400,000 for the

Tremont real estate properties, including the market and gas station facilities, and a value of $200,000 for the ownership interest of Ruby Red, Inc.

As noted below, the Defendant has appropriated about $30,000 in income from Ruby Red, Inc. for her own purposes. This amount is imputed to her in the attached table. Plaintiff asks that she be required to reimburse him for his presumptive half of the amount. However, because the court has factored each party's receipt of income from the various businesses into the overall allocation set forth in the attached table, to require reimbursement would in effect be double counting. Thus, the net proceeds of sale of the Ruby Red, Inc. assets and the Tremont real estate will be divided equally between the parties.

The procedure for sale is set forth later.

*VII.     Northeastern Seafood, Inc. and 126 Clark Point Road*

NES is a commercial lobster business in which the parties are both 50% shareholders. NES operates out of the land and buildings located at 126 Clark Point Road, Southwest Harbor, Maine (the "Wharf"). NES buys lobsters from fishermen, sells lobsters to commercial and retail customers, and supplies bait, salt, and fuel to fishermen. Defendant founded the business in 1986 as Fish Unlimited and mainly through her own effort grew it into a successful business. Plaintiff contributed to the growth of Fish Unlimited by catching seafood, but it was mainly Defendant's talent, time and energy that grew the business. Much later, around 2007, Plaintiff took over primary responsibility for managing the business, and did so until this court's November 3, 2015 Interim Order pursuant to which Defendant was to assume responsibility for the business operations of NES.

During the pendency of the case, the parties agreed that the Wharf property be put up for sale. The listing produced a $1,500,000 offer to purchase the Wharf, but the Defendant changed her mind about selling the Wharf and the property was taken off the market.

Plaintiff asserts that the Wharf's fair market value is $1,950,000, consistent with Theodore Webersinn's October 2, 2013 appraisal. Plaintiff claims this valuation is supported by Defendant's rejection of an offer to buy the Wharf for $1,500,000 as too low. However, although he values the Wharf property highly, Plaintiff does not propose the property be allocated to himself, Instead, Plaintiff proposes that the Wharf be allocated to Defendant as her sole and exclusive property and that she bear responsibility for all outstanding debt, including mortgages, equity loans, commercial lines of credit, taxes, insurance and all other costs associated with the Wharf. Plaintiff further proposes that Defendant be allocated full ownership of NES along with its business assets and liabilities. Plaintiff requests that Defendant be required to refinance the mortgage debt on the Wharf, or otherwise remove Plaintiff as a named debtor or guarantor on these loans within 90 days from the entry of this Order.

For the reasons given in section IV above, the Wharf real estate and the associated trucks, trailers and other items will be sold and the other assets of NES will be liquidated as well. For purposes only of determining whether there is a need to award spousal support to either party, the court fixes the value of the Wharf property, the net value of NES, and the associated structures and equipment at $1,600,000.

As of February 29, 2016, the parties agreed that the balances in the NES checking accounts are $10,000 in Machias Savings Bank #5990, $2,667 in Bar Harbor Bank & Trust

14

#7043, and $22,490 in The First #0386. Furthermore, NES owes $248,787 under The First Line of Credit #1738 and $96,973 under the Machias Line of Credit #3745. Neither party appears to think that the NES business has any particular value (i.e. goodwill) as a going concern, independent of the value of the Wharf property.

However, Defendant makes allegations of economic misconduct in connection with the Plaintiff's operation of NES. These allegations and Plaintiff's response are discussed below.

The funds in the two checking accounts with The First numbered -0386 and -0394 and the funds Bar Harbor Bank & Trust Account #7043 are operating accounts for use in the operations of NES. Any balance left after sale will be equally divided. The tractor-trailer trucks, refrigerated trailers, and refrigerated box trucks owned by NES be sold with the net proceeds split equally since neither party wishes to retain them. The remaining assets of NES, Defendant asserts, consist of office equipment and equipment related to the dock operation, which are valued at less than $15,460.

### VIII. *The Dictator, Inc.*

Plaintiff is the sole shareholder of Dictator, Inc., which owns a scallop fishing boat and associated fishing permits. Plaintiff began scallop fishing in 1979 when he and the Defendant first moved to Maine. Over the years, Plaintiff has developed the Dictator into a profitable business. He was actively involved in the Dictator's operations, but in recent years has taken on a managerial role, with a hired captain and crew doing the actual fishing.

The parties agree that the combined fair market value of the fishing vessel Dictator, including its equipment and federal permit, is $4,500,000. The parties also agree that the vessel is encumbered by a primary loan to The First for $317,560 as of February 29, 2016 under The

15

First Account #8249.  Furthermore, the parties agree that the Dictator has an operating account with The First ending in #2028 with a balance of $44,942, a Capital Account with HM Payson ending in #3171 with $160,049.50, and a Line of Credit with the First ending in #7143. Plaintiff asserts that the amount currently owed on the #7143 Line of Credit is $100,000, while Defendant asserts it is only $80,000.

Plaintiff proposes that the Dictator, Inc., including all of its assets, be set aside as his sole and exclusive property.  Plaintiff agrees to assume responsibility for all liabilities associated with the business and will indemnify and hold Defendant harmless against the same. Plaintiff also argues that the court should take into account the inherent tax on the recovered depreciation of the boat should it be sold.  Plaintiff and Thomas O'Donnell, the accountant at MacDonald Page, LLC who has done tax work for Dictator, Inc., calculate the tax liability in the event of a sale to be $504,900.  Plaintiff and Mr. O'Donnell further calculate that the 2015 income taxes owed by Plaintiff on the Dictator Inc.'s income is $191,366.  Plaintiff contends that all of the Dictator's 2015 income was used to finance the parties' expenses and fees in this matter, the corporate line of credit has been maxed out, and there is no other money available to pay these taxes.  While Plaintiff filed for extensions to pay the taxes, he suspects it may not be granted and he may be charged a penalty of somewhere between 5% and 25% of the taxes due per month until his return is filed.  This could result in an additional liability of $47,000.

Plaintiff further contends that pursuant to the April 1, 2014 Interim Order, the profits from Dictator, Inc. were distributed to pay the parties' respective expenses in uneven shares favoring Defendant.  Specifically, Plaintiff received $6,000 per month and Defendant $10,000. The $4,000 difference between the parties was to cover the mortgage on the residence in which

Defendant resides. In February 2015, the Interim Order was amended to provide Plaintiff and Defendant with $7,500 each and a payment of $3,645 to Defendant for the mortgage. Plaintiff contends that since he has received less than 50% of the benefit from all of Dictator Inc.'s profits, it is fair to include 100% of the tax liability on the income as an obligation of the marital estate and makes sense to reduce the value of Dictator, Inc. by its present and prospective tax liabilities.

Defendant proposes that the fishing vessel and its permit be sold by a commercial marine broker at the end of the 2016 fishing season. In support of this position, Defendant contends that the boat fishes out of Fairhaven, Massachusetts and that Plaintiff's operation and management of Dictator, Inc. requires minimal time and effort. Defendant further asserts that Plaintiff has improperly used Dictator, Inc. corporate funds for his personal benefit, claimed personal expenses as business expenses on the Dictator, Inc.'s corporate tax returns, and mismanaged the operation of the Dictator, Inc. to the detriment of the marital estate. She argues that Plaintiff's financial misconduct benefited him, to the detriment of the marital estate, by approximately $330,534. Like Defendant's other allegations of economic misconduct, these allegations are discussed below.

For the reasons indicated above, the assets of Dictator, Inc., including the vessel and all tangible and intangible property related to it, will be sold under the supervision of the Referee after the 2016 fishing season, unless stipulated otherwise by the parties. The Dictator capital account (-3171) may be used to fund Dictator's expenses pending sale, and after sale any balance shall be divided equally between the parties. The court agrees with the Plaintiff that any and all taxes, interest and penalties due, both with respect to income earned by Dictator,

17

Inc. and with respect to the sale of the assets of Dictator, Inc., should be shared between the parties. This is just and equitable only because the court is addressing economic misconduct on the part of Plaintiff separately.

## IX. *Personal Property*

### A. Snowmobiles and Motorcycles

Defendant asserts that at the time of Phase I of the Trial in January, 2015, the parties owned eight snowmobiles. Defendant values these snowmobiles, based on the NADA Guide, at a total of $85,000. Plaintiff contends that the parties only own seven snowmobiles and estimates their value to be $43,600. Plaintiff also asserts that any expenditures made on the snowmobiles were with his own personal debt, for which he has accepted sole responsibility. If the court does not accept the values Plaintiff proposes, he requests that the five snowmobiles purchased prior to the divorce be allocated to the Defendant at her estimated value. As indicated in the attached table, the parties' snowmobiles are awarded to Defendant at the total value she has assigned to them.

The parties have three motorcycles. Defendant proposes that she receive the 2006 Harley FLSTN1 Heritage Soft-Tail, while Plaintiff receives the 1986 Harley FXRS Liberty and 2010 Harley FLXH Street Glide. Plaintiff disagrees with her allocation only to the extent the court accepts Defendant's valuations, in which case Plaintiff requests that all of the motorcycles be allocated to Defendant. The court has assigned values to the three motorcycles and accessories and allocated them as shown in the attached table.

### B. Power Tools, Hand Tools, and Other Machinery and Equipment

18

Defendant contends that a conservative estimate of the value of Plaintiff's collection of tools, equipment, and machinery is $200,000. Plaintiff disputes this value and requests that if the court accepts Plaintiff's valuation, the tools and equipment be allocated to Defendant at said value. The court does not accept Defendant's valuation and finds it just and equitable to allocate to Plaintiff the tools, equipment and machinery at the value of $100,000 as set forth in the table attached to this order.

C. The Mercedes 280i

Defendant requests that she be awarded a Mercedes 280i as her non-marital personal property. Plaintiff responds that the car does not belong to either party and was left by someone in storage who never paid the bill. It is not clear how Plaintiff proposes the car be allocated or disposed of. The court allocates the Mercedes 280i to Defendant, subject to a condition that she indemnify the Plaintiff against any liability to any third party associated with the vehicle. Given that it is either non-marital property or property owned by a third party, no value needs to be assigned to the Mercedes for purposes of the allocation.

D. Equipment, Watercraft and Trailers

The attached table contains a list of various equipment, watercraft and trailers. The court finds it just and equitable to allocate these items at the indicated values as set forth in the table attached to this order.

Furthermore, the parties agree to sell a 2011 Massey Ferguson Tractor with accessories in a commercially reasonable manner and to split the proceeds equally. Unless the parties agree otherwise, Defendant will contact Union Farm Equipment in Union, Maine and Kramer's

19

Equipment in Sidney, Maine and, on the parties' behalf, sell the tractor to the company who will pay the higher price.

E. Maps at the Sullivan Camp and Furnishings and Goods from 60 Beech Hill Road

Plaintiff is awarded the maps at the Sullivan Camp located at 68 Mountain View Road, as they were a gift. Except for items allocated by agreement, which are listed in the next section, Defendant is allocated all goods and furnishings at 60 Beech Hill Road and Plaintiff is allocated the goods and furnishings at the Sullivan Camp. Any disparity in value between the goods and furnishings at the Sullivan Camp and 60 Beech Hill Road is not significant.

F. Stipulated Distributions of Tangible Personal Property

The court allocates the items listed below to the party indicated and at the values stated. Where no value is assigned, it is because the item was a gift to a party or inherited by a party, or is not of significant value, and thus need not be assigned any value in the table. An X in the table indicates the item is either non-marital or has no value that would be material to the overall allocation.

| Assets/Liabilities | Plaintiff | Defendant |
|---|---|---|
| Coins to Plaintiff | $11,414.00 | |
| Tiger Woods Card Collection to Plaintiff | $5,000 | |
| Grandfather's Saw to Plaintiff | X | |
| Assorted Silver, China, Pictures and Family Memorabilia to Defendant | | X |
| Jewelry to Defendant | | X |
| Plaintiff's Grandfather's Album to Plaintiff | X | |
| Old Tin Picture of Plaintiff's Family to Plaintiff | X | |
| Two Push Mowers to Plaintiff | $50 | |
| Plaintiff's High School Ring to Plaintiff | X | |
| Chain Saw to Plaintiff | X | |

20

The parties dispute who should receive items referred to in their filings as the Marble game and the Old Propeller from the Dictator. The Marble Game is awarded to Defendant and the Old Propeller is awarded to Plaintiff, with neither item having value material to the overall allocation.

## X.    *Intangible Personal Property*

### A.  Funds in Plaintiff's Safe Deposit Box

Defendant asserts that Plaintiff has $50,000 in a safe deposit box. Plaintiff initially stated that he had $36,000 in the safe deposit box, but then corrected that calculation to $32,500. Both parties agree that the money in Plaintiff's safe deposit box should be allocated to him. Plaintiff's proposed findings assign a value of $36,000, and awards those funds to him, and the court agrees.

### B.  Funds in Defendant's Safe Deposit Box

Plaintiff asserts that Defendant has $200,000 in a safe deposit box. He asserts that this amount was based on the last time he accessed Defendant's safe deposit box in 1998. Plaintiff claims that the dates of Defendant's trips to the safe deposit box do not coincide with the dates and events she asserts the money was taken out for. Accordingly, Plaintiff asserts that Defendant is in possession of and should be allocated the $200,000 from her safe deposit box.

Defendant responds that since Plaintiff's last entry to the box in 1998, she accessed it once in November 2001, three times in August and September 2002, once in July 2003, and then not again until February 10, 2014. Defendant's February 10, 2014 visit to the box, she asserts, was to enable her to respond to an interrogatory inquiring about the contents of the box. Defendant testifies that she took out money in the safe deposit box in 2001, 2002 and

21

2003, and that there was no money in the box when she went to the box to answer Plaintiff's interrogatories. Accordingly, she asserts that she should not be allocated any funds for the amount in the box, as there is nothing left.

The court accepts Defendant's testimony on this point, and finds that she removed the funds many years before this divorce case was filed and used the funds for the benefit of both parties. The court therefore makes no award to either party.

C. H.M. Payson Brokerage Account #3108

The parties' H.M. Payson Brokerage Account #3108 has a value of $834,728 as of the date of trial. Of the assets in the account, 700 shares of Apple, Inc. stock are Defendant's non-marital property, and the remaining assets are marital.

As indicated in this court's October 20, 2015 Order, the Brokerage Account initially consisted of non-marital assets from Defendant—including the Apple stock—totaling $492,669 and marital assets totaling $150,110. Over time, the value of the account increased by approximately $220,000. The Order concluded that although Defendant contributed approximately three-quarters of the value to the Brokerage Account in non-marital funds, the only non-marital property that had not been extensively commingled over time was the Defendant's 700 Apple stock. The Order also found and concluded that it was not possible to determine to a certainty the extent to which the substantial increase in value of the account was due to the original marital component as opposed to the original non-marital component.

With this analysis in mind, the court reaffirms its determination that the 700 Apple stock are Defendant's non-marital property. However, based on her substantial contribution to the account of $492,669 in non-marital funds that have been inextricably commingled with the

22

originally contributed marital funds, the court concludes that it is just and equitable to award the Defendant 65% of the value in the brokerage account ending in -3108, and to award the remaining 35% to Plaintiff.[2] (Economic misconduct is not a factor in this determination).

D. H.M. Payson Brokerage Account #4103

Before Phase II of the Trial, the parties stipulated that the value of H.M. Payson Brokerage Account #4103 was $583,995. Subsequently, the court ordered payment of $40,000 from this account for attorney fees by Order dated March 28, 2016. Accordingly, Brokerage Account #4103 has a present value of $543,995. Plaintiff requests that the assets in Account #4103 be used to pay the amounts owed to MacPage, LLC for work performed by it related to tax years prior to 2015. Plaintiff requests that the remainder be split such that 78% go to Plaintiff and 22% to Defendant. Defendant counters that all of the money in Account #4103 came from money saved by Defendant in a predecessor account during her operation of NES prior to 2005. She asserts that no further contributions were made after 2005 and, as a result, the court should allocate the entire amount to Defendant due to her contributions to the account and Plaintiff's mismanagement and misappropriation of marital property.

Although the evidence does, to an extent, support the Defendant's contention that her efforts more than Plaintiff's account for the funds in this account, Plaintiff could make the same argument about the very significant income that the Dictator has generated over the years. It was his effort, more than Defendant's, that led to the financial success of the Dictator, which

---

[2] Defendant requests that she be awarded her non-marital Apple stock and 76% of the marital funds in the account based on her non-marital contributions of $492,669 being 76% of the total amount originally deposited into the account. However, the Apple stock that is being awarded as a non-marital asset was part of her non-marital contribution, so the actual ratio of her non-marital contribution to the original total amount contributed is less than 76%.

has been far more profitable than either Ruby Red, Inc. or NES in recent years. Accordingly, Defendant's argument regarding this account is not accepted by the court.

As to MacPage, Defendant asserts that MacPage has not submitted an itemized bill for services and, as a result, the court should not make any determination of the amount owed or allocate responsibility for any debt owed MacPage. As to the MacPage debt, the court agrees that no determination of the amount owed is necessary, but does allocate responsibility to each party for one-half of the liability to MacPage for accounting work that benefited both parties.

E. The Parties' Individual Accounts

The parties have agreed that the following five individual accounts should be distributed to the individual in whose name the account was created without consideration of the account values since they are made up of post-divorce funds:

1. Defendant's The First Savings Account #6651;

2. Defendant's The First Checking Account #2477;

3. Defendant's Camden National Bank Account #4957;

4. Plaintiff's The First Checking Account #0822; and

5. Plaintiff's Camden National Bank Account #4957.

The parties have also agreed that Plaintiff should be solely responsible for the debts at Machias Savings Bank Line of Credit #1165 and Machias Savings Overdraft #7250. The parties further agree that these debts should be allocated to Plaintiff without consideration of the obligations in the allocation of marital property. The court concurs with the parties' stipulations and orders the above-mentioned accounts so allocated.

F. The Boat Moorings

24

Plaintiff requests that the parties' boat moorings, one in Somes Sound and one in Southwest Harbor, be set aside to him as his sole and exclusive property since he is the one who utilizes them. Defendant requests that she be awarded both moorings and also responds that Plaintiff should not receive them because he has no connections to Southwest Harbor in light of his lack of interest in maintaining control of NES and the Wharf. Plaintiff is awarded the Somes Sound mooring. The Southwest Harbor mooring will be sold with the Wharf property or as an asset of Northeastern Seafood, Inc.

G. Plaintiff's Rental Income from the Camp

Defendant proposes that the Machias Savings Account #7250 be allocated to Plaintiff without consideration of value, but requests that the court consider the rental proceeds retained by Plaintiff and not reported to the Referee as rental income when distributing property. Plaintiff responds that there was no prohibition against Plaintiff renting the camp when he was not using it and that the rents were used to reduce his personal line of credit. Plaintiff responds that his rental income has not harmed Defendant and that she could have done the same with the property at 60 Beech Hill Road if she wished. The court agrees with Plaintiff on this issue—each party has had the right to use or rent out the property that the parties agreed each could use, and rental income is simply a substitute for the value of use of a property. Accordingly, the court declines to consider the rental proceeds at issue. Thus, the court allocates the Machias Savings Account #7250 to Plaintiff without factoring its value into the overall allocation.

25

## H. Sheryl Rentals and Harper Rentals

Each party has operated rental properties, maintained accounts relating to the properties, and received rental income. Defendant has managed Sheryl Rentals, which is responsible for managing the Tremont Properties and the house at 252 Seawall Road. Sheryl Rentals has a checking account with The First #3057 that has a balance of $2,708, as of February 29, 2016. Plaintiff manages Harper Rentals and is responsible for renting out the warehouses at 250 Seawall Road. Harper Rentals has a checking account with The First #9043, with a balance of $6,857 as of February 29, 2016.

Each party uses the funds in their respective accounts to pay the mortgages encumbering the properties they manage. Defendant asserts that because the balances in these accounts vary constantly, depending on the expenses of the respective properties and rents collected, they should be allocated to the party responsible for the account without consideration of their value.

Plaintiff further responds that NES is obligated to pay Harper Rentals back rent and maintains that Harper Rentals, not NES, paid the NES mortgage until it was paid off in 2012 and that Harper Rentals has always billed NES for the rent. However, the court concludes that NES does not owe any money to Harper Rentals because NES paid for the mortgage on the 126 Clark Road property until it was paid off.

Here, the court allocates The First Checking Account #3057—valued at $2,708—associated with Sheryl Rentals to Defendant. Similarly, the court allocates The First Checking Account #9043—valued at $6857—associated with Harper Rentals to Plaintiff. Because both

26

accounts are considered operating accounts rather than assets, they are considered for purposes of equitable distribution.

I. Cardente Request

On May 26, 2016, the court received a letter from Michael Cardente on behalf of Cardente Real Estate in which he request the court to consider granting him compensation for Cardente Real Estate's efforts in connection with the sale of the Wharf property. The letter was not properly authenticated or introduced as evidence. Therefore, the court will not consider the contents of the letter, or otherwise address Cardente's request. However, the Referee is free, in his discretion, to list the Wharf property again with Cardente Real Estate.

XI. Money Allegedly Owed Under the First Interim Order

Defendant asserts that Plaintiff owes her $2,733.01 for her payment of the insurance premium on the Sullivan Camp and Plaintiff's failure to pay health insurance premiums under the April 1, 2014 First Interim Order. Defendant alleges that the First Interim Order obligated Plaintiff to pay the homeowners insurance on the Sullivan Camp, but Plaintiff told his bookkeeper not to pay and instead sent the bill to Defendant. Defendant asserts that she paid the bill mistakenly thinking it was her obligation only to learn that it was for the Sullivan Camp and Plaintiff's responsibility. The exhibit Defendant cites to in support of this argument only shows an insurance bill with a minimum due of $375.50. Def. Ex. 126. Defendant further asserts that Plaintiff underpaid Defendant's insurance premiums for eleven months until the February 27, 2015 order made each party responsible for his or her own health insurance costs. In support Defendant points to an exhibit showing an alleged underpayment of $55.95 on April 16, 2014 and again on April 30, 2014. The alleged $55.95 underpayment twice a month for

27

eleven months adds up to $1,230.90. She also asserts that Plaintiff only paid Defendant $8,257.94 of the $10,000 due to her for the first payment covering reasonable expenses under the First Interim Order. In support Defendant points to a check for $8,257.94 to Plaintiff from April 10, 2014. Writing on the exhibit, however, notes that an additional $1,500 was received in March or April and that Plaintiff was only $242.06 short of the requisite payment. In sum, Defendant requests Plaintiff reimburse her $2,733.01 for the Sullivan Camp insurance premium and for monies due pursuant to the First Interim Order.

Here, the evidence presented in support of Defendant's argument only indicates that Plaintiff underpaid her by $729.46. Within 60 days, Plaintiff will reimburse Defendant that amount, which is not shown in the allocation of marital property attached to this Amended Judgment.

XII.    *Defendant's Request to Reconsider the First Interim Order*

Defendant requests the court reconsider the April 1, 2014 First Interim Order to the extent it addresses responsibility for business insurance. Specifically, Defendant requests that Plaintiff reimburse her $7,500 for funds she expended purchasing duplicative insurance coverage for Ruby Red, Inc. and the Tremont Properties. Defendant explains that during the course of the parties' marriage, all vehicles owned by NES and all business property and liability insurance for NES and Ruby Red, Inc., as well as insurance on the Tremont Properties, Seawall Road and 126 Clark Road, were consolidated in a package insurance policy issued by Hanover Insurance Company. On December 12, 2013, the agent for the insurance company informed Hanover that the parties were going through a divorce and wished to separate NES and Ruby Red, Inc. coverage into two separate policies at renewal. Thereafter, Plaintiff

28

obtained insurance coverage for NES and informed Defendant, just prior to the expiration of the policy, that it was up to her to find insurance for Ruby Red, Inc., the Tremont Properties, and her automobiles. Defendant asserts that because the Tremont Properties and McKinley Market were the least favorable risks, she was only able to obtain surplus coverage for Ruby Red, Inc. and the Tremont Properties. The cost of this insurance to Defendant was $7,500. Plaintiff does not specifically respond to this argument, but generally denies any charges of economic misconduct or wrongdoing.

In the First Interim Order, the District Court addressed Defendant's $7,500 payment for the first three months of replacement coverage by requiring Plaintiff to pay the next three months of insurance premiums. This was a fair result and the court denies Defendant's request to revisit the issue.

### XIII. *Petition for Distribution of Funds to Pay 2015 Income Taxes*

Plaintiff petitioned the court for a distribution of funds to pay individual 2015 state and federal income taxes. When Plaintiff filed his motion, he presented the court with a letter from his accountant providing an estimate of his tax liability. Now, Plaintiff seeks an award of $183,458 for taxes.

Defendant asserts that the draft tax return Plaintiff submitted at trial estimates his tax liability without considering any losses that may be posted by NES. To complicate matters, Plaintiff has allegedly refused to prepare a tax return for NES. Defendant asserts that NES's tax return is necessary to definitely establish Plaintiff's 2015 tax liability.

Defendant further explains that income from Dictator, Inc. is the primary basis for Plaintiff's 2015 income tax estimate, but at no point during 2015 did Plaintiff make quarterly

29

payments toward his tax liability or request permission from the Referee to reserve funds for income taxes. Defendant further asserts that Plaintiff refused to file a joint extension with Defendant because he had issued a 2014 1099-MISC to Defendant for $83,780.34 from Dictator, Inc. and a W-2 for $3,434.12 from NES.

Defendant acknowledges that she has received the benefit of income from Dictator, Inc. and, for 2015, her share was $152,744.00. Since Plaintiff's draft return indicates his combined tax rate for 2015 state and federal taxes is 38.5%, the tax on Defendant's court ordered payments would be $58,806.00. Defendant requests the court take this amount into consideration in fashioning the equitable division of marital property and allocate the responsibility for 2015 state and federal income taxes in Plaintiff's name to Plaintiff.

This Amended Judgment imputes substantial income from Dictator, Inc. and NES to Plaintiff. Given that fact and the fact that Plaintiff has incurred taxes on income that went to the benefit of both parties, any and all taxes, penalties and interest incurred by Plaintiff as a result of his ownership interest in Dictator, Inc. shall be borne equally by the parties. Also, any capital gains tax or other tax (including transfer tax, if any) triggered by the sale of the assets of Dictator, Inc. will be borne equally by the parties. However, unless the parties stipulate otherwise in writing, no distribution to make the tax-related payments will be ordered. Instead, the taxes will be paid from the proceeds of the sale of the assets of Dictator, Inc. If Plaintiff proves he has already made payments toward his tax liability, Defendant will reimburse him for half of what he has paid.

*XIV.   Spousal Support*

30

The issue of spousal support arises primarily in the context of Defendant's request that she be awarded spousal support if Plaintiff is awarded Dictator, Inc. Because this Amended Judgment requires the sale of the assets of Dictator, Inc., that basis for spousal support does not apply.

However, Defendant further asserts that she is entitled to spousal support because Plaintiff's management of the businesses owned by the parties has greatly impacted the parties' entitlement to Social Security. Specifically, she asserts that Plaintiff will be entitled to $2,223 per month at his full retirement age—or $3,054 if he waits until age 70, while Defendant is only entitled to $1,222 per month at full retirement age—or $1,565 per month if she waits until age 70.

Plaintiff asserts that the parties' age, earning history, and earning capacity are approximately equal, that each will likely be allocated sufficient assets to support themselves in the lifestyle to which they are accustomed, and that neither party should pay spousal support to the other.

An order granting, denying, or modifying spousal support must state:

A. The type or types of support, if any is awarded;
B. The method or methods of payment and the term and limitations imposed, if support is awarded;
C. If the support awarded is not, in whole or in part, subject to future modification; and
D. The factors relied upon by the court in arriving at the decision to award or deny spousal support, if the proceeding was contested.

19-A M.R.S.A. § 951-A(1) (2015). The factors the court must consider when determining an award of spousal support are:

A. The length of the marriage;
B. The ability of each party to pay;
C. The age of each party;
D. The employment history and employment potential of each party;

31

E. The income history and income potential of each party;

F. The education and training of each party;

G. The provisions for retirement and health insurance benefits of each party;

H. The tax consequences of the division of marital property, including the tax consequences of the sale of the marital home, if applicable;

I. The health and disabilities of each party;

J. The tax consequences of a spousal support award;

K. The contributions of either party as homemaker;

L. The contributions of either party to the education or earning potential of the other party;

M. Economic misconduct by either party resulting in the diminution of marital property or income;

N. The standard of living of the parties during the marriage;

O. The ability of the party seeking support to become self-supporting within a reasonable period of time;

P. The effect of the following on a party's need for spousal support or a party's ability to pay spousal support:

1) Actual or potential income from marital or non-marital property awarded or set apart to each party as part of the court's distributive order pursuant to section 953; and

2) Child support for the support of a minor child or children of the marriage pursuant to chapter 63; and

Q. Any other factors the court considers appropriate.

19-A M.R.S.A. § 951-A(5). The types of spousal support the court may award include: A) general support to provide financial assistance to a spouse with substantially less income potential than the other spouse so that both spouses can maintain a reasonable standard of living; B) transactional support designed to provide for a spouse's transitional needs; C) reimbursement support to achieve an equitable result in the overall dissolution of the parties' financial relationship in response to exceptional circumstances such as economic misconduct, or substantial contributions by one spouse towards the educational or occupational advancement of the other during the marriage; and D) nominal support to preserve the court's authority to grant spousal support in the future. 19-A M.R.S.A. § 951-A(2). The court's order must state the method or methods of payment that the court determines just including, but not limited to

32

lump-sum and installment payments. 19-A M.R.S.A. § 951-A(3). The award must also state the term of and any limitations on the award that the court determines just. *Id.*

Based on the allocation of the parties' assets and property, the court finds and concludes that no award of spousal support is necessary or appropriate, even though Plaintiff's Social Security entitlement will be greater than Defendant's. Both parties will have ample assets and neither has shown a justification for an award of spousal support, in light of the overall allocation of the parties' assets, liabilities and property. Any disparity in the parties' expectancies regarding Social Security is adequately addressed in the allocation of assets and property.

*XV. Economic Misconduct and Imputed Income*

The issue of economic misconduct enters the case mainly as a result of Defendant's accusations against the Plaintiff, although the Plaintiff makes accusations as well.

Plaintiff asserts that Defendant mismanaged McKinley Market and NES and that she took $200,000 from a safe deposit box. Although there is some merit to the mismanagement issue, particularly as to McKinley Market, it does not rise to the level of economic misconduct. Defendant did appropriate about $30,000 in income from Ruby Red, Inc. for her own benefit and the attached allocation table at page 4 treats her as having received that income. As to the $200,000 that had been in the safe deposit box, as noted elsewhere herein, it appears to have been utilized for the parties' common benefit years ago rather than misappropriated for Defendant's own benefit.

Defendant's allegations of misconduct fall into three areas, two of which the court finds meritorious. First, she claims that Defendant charged numerous personal expenses to various

33

businesses. In fact, both parties have charged personal expenses to the various businesses, so some of the Defendant's allegations, while valid, apply as much to her as to the Plaintiff. This area of Defendant's claim of economic misconduct does not justify any particular award or other adjustment to the allocation of the parties' property and assets.

However, Defendant's allegations with respect to Dictator, Inc. and NES were in fact proven. Defendant's evidence established that Plaintiff improperly used substantial corporate funds from NES for his personal benefit while he was managing the business and committed economic misconduct by not reporting cash received from retail lobster sales between 2007 and 2015. More specifically, Defendant showed that Plaintiff used two separate bookkeeping systems at NES, one that Plaintiff controlled and used, and one that was handled by his bookkeeper. Despite the existence of these two systems, Plaintiff has refused to provide records from the system that he personally maintained. In addition, Plaintiff caused NES to stop accepting credit cards for the retail sale of lobsters and then utilized this change to retain cash received from lobster sales without recording it as corporate income. In 2012, Plaintiff stopped NES from selling lobsters except to two customers, causing the income NES derived from lobster sales to fall dramatically.

Defendant's proposed findings of fact and conclusions of law spell out the details of Plaintiff's mismanagement and misconduct regarding NES in compelling detail. The court adopts and incorporates by reference Defendant's recitation of this aspect of the evidence. *See* Defendant's Proposed Judgment, Finding[s] of Fact And Conclusions of Law at 28-33.

34

In addition, the evidence clearly establishes that, while he was managing NES, the Plaintiff took out two lines of credit, the balance of which totals nearly $350,000. Before Plaintiff took over, NES had only limited debt and had substantial cash

Similarly, Defendant has proved economic misconduct on the part of Plaintiff with respect to Dictator, Inc. The court adopts the following as its findings from the Defendant's proposed findings:

In 2012, Mr. Harper used of Dictator, Inc. funds for motorcycle repairs by Lewis Boyle in the amount of $6,000, Def. Exh. 104, pg. 6; one payment to Lamont Rice for $4,000 and one to Dana Rice for $1,500 which had no legitimate business purpose, Def. Exh. 104. pgs 8,9; an unexplained payment to Bruce Stewart in the amount of $1,200; Def. Exh. 104. pg. 18; a payment to Eric Olson of $3,100 for a camp in Rockwood, Def. Exh. 104. pg. 20; Bank of America charges for gas, travel, hotels and personal radio for Pandora and Sirius radio. Def. Exh. 104. pgs. 2,3,6,10,12,16,17,18; and payment of his personal Capital One credit card from Dictator, Inc. Def. Exh. 104, pg. 5. He also took a year-end bonus by payment to the payroll account of $200,000. Def. Exh. 104. pg. 20;

In 2013, for the entire year the divorce was pending and Mr. Harper was subject to the preliminary injunction prohibiting use of funds except for in the ordinary course of business, he used funds generated by Dictator, Inc.. for his own personal benefit without the knowledge or consent of Sheryl W. Harper. Dictator's 2013 Expense Report (Def. Exh. 112) reveals he made a payment for rent of a camp from Eric E. Olson, Jr. in Rockwood for $3,100; made payment to Jackman Power Sports $584 for work on his snowmobiles; made payment to Lewis Boyle $3,000 for motorcycle work; paid River Valley $10,924 for new snowmobile and $350 for a snowmobile warranty; paid his divorce lawyers, Taylor, McCormick & Frame $7,500; paid two payments of $4,030 and $3,700 to TMR as a donation to the Iron Dog Snowmobile Run in Alaska; and paid the Town of Jackman $751 for his snowmobile registration. At year end, Mr. Harper transferred $150,000 to the payroll account to pay himself a bonus. Def. Exh. 104, pg. 41.

In 2013, Mr. Harper also expended $20,980 on the corporate credit card. Def. Exh. 112. Charges on the Bank of America credit card ending 0852 and 6246 far exceeded the $6,088.39 Bank of America charges in 2012 (Def. Exh. 104, pgs. 2,3,6,10,12,16,17,18) and the $5,047.02 Bank of America charges in 2015. Def. Exh. 111A. In 2013, Mr. Harper did not make a single trip down to Fairhaven, Massachusetts to the boat between January, 2013 and his deposition in mid-October, 2013.

In 2014, Mr. Harper continued his use of Dictator, Inc. corporate funds for his personal benefit, despite the court's order. He paid his experts Dawson, Smith, Purvis & Bassett $7,000, donated $200 to his girlfriend's charity, Literacy Volunteers, paid Richard Nauzerolle $3,785, for a reason Mr. Harper could not remember, and paid

35

$7,000 to Nicholasville Toyota for his daughter's car. Def. Exh. 111, Def. Exh. 105, and Def. Exh. 105B.

Further, in 2014, Mr. Harper paid himself in February, 2014, at a time when he had shut down the joint household account, and closed the only credit card Sheryl E. Harper had prior to his snowmobiling trip to Alaska and Sheryl had no access to any income. Def. Exh. 111A, pg. 3; Def. Exh. 105, pgs 18, 19 of 22. Upon return from his vacation, he paid himself another $8,500 on March 24, 2014. Def. Exh. 105, pg. 17 of 22.

In 2015, Mr. Harper's operation of Dictator, Inc. was subject to this Court's Amended Interim Order, dated February 27, 2016, and was under the oversight of the Referee. During that year, gross receipts increased over $500,000 over 2014. *See* Def. Exh. 112A compared to Def. Exh. 111. Even though the Referee was monitoring account activity, Mr. Harper paid $20,800 towards a camper out of Dictator funds on July 15, 2016, (Def. Exh. 105A); managed to pay all auto expenses for his personal use of his Ford truck out of Dictator, Inc. (Def. Exh. 112B), and purchased a brand new 2016 Ford F350 truck and incurred a new truck loan 10 days after the November 2, 2015, scheduled hearing. Def. Exh. 112D, Def. Exh. 105A. This occurred at a time when Mr. Harper reported to the Referee he needed to draw cash from Dictator's credit line and therefore could not transfer money to the Referee account. Joint Exh. 48E.

Defendant's Proposed Judgment, Finding[s] of Fact and Conclusions of Law at 26-27.

Plaintiff challenges Defendant's allegations of misconduct asserting that they are not supported by reliable evidence, ignore the fact that both parties aggressively characterized expenses as business expenses, and ignore the reality that Plaintiff was required to continue operating NES while divorce proceedings were under way even though he expressed no interest in doing so. Furthermore, Plaintiff responds that it was Defendant, not he, who exercised bad faith during the transition of NES as supported by the trial testimony of Mike Smith.

The court has weighed the evidence and finds and concludes that Defendant has proved clearly and convincingly, i.e. that it is highly probable, that Plaintiff has engaged in economic misconduct to the extent of taking at least $800,000 from what should have been shared income from NES and Dictator, Inc., of which Defendant's presumptive half-share would have been

about $400,000. The $800,000 figure reflects what the court finds to be substantiated in largely undisputed transactions.

In some respects, whether Plaintiff is in fact guilty of economic misconduct may be beside the point—the salient point is that the evidence shows that he appropriated for his own benefit a marital asset in the form of income from the Dictator and NES businesses, just as Defendant used $30,000 from the income from Ruby Red, Inc. for her own purposes. The attached table of allocated marital property imputes these amounts as income to each of the parties.

In addition, Defendant demonstrated that the Plaintiff opened and drew down the two lines of credit, with The First and Machias Savings Bank, relating to the Wharf property, and has not explained what happened to most of the amounts drawn on the lines. Based on the extensive evidence regarding Plaintiff's economic misconduct with respect to NES, this Amended Judgment allocates responsibility for paying The First line of credit solely to the Plaintiff, and requires that the line be paid off either by him or from his share of the proceeds of the sale of the Wharf property and the assets of NES. The Machias Savings Bank line of credit will be treated as a joint obligation.

### XVI. Attorney Fees

Plaintiff requests that each party be individually responsible for his or her attorney fees.

In addition to her claims of economic misconduct, Defendant asserts that Plaintiff should pay Defendant $15,000 to make up for the additional amount he received, pursuant to court order, for attorney fees from marital funds. Defendant further asserts that Plaintiff's actions have increased the cost of litigation, delayed final resolution, and should be calculated

37

into the court's equitable division of assets and allocation of debt. For example, Defendant contends she was forced to file a motion to enforce a $10,000.00 payment due to her under the April 1, 2014 First Interim Order. She contends that Plaintiff claimed he did not have sufficient funds to pay Defendant, but purchased a new snowmobile on November 26, 2014. Up to a point, the record confirms Defendant's position. Only after an in-chambers conference did Plaintiff make the payments owed to Defendant.

In addition, Defendant claims that Plaintiff failed to inform the court of the funds he made during a January, 2015 fishing trip or that he had deposited $60,000 into his personal account to pay his lawyers and experts. Defendant asks the court to consider this conduct in its allocation of attorney fees.

The court may order a party to pay another party's reasonable attorney fees, including costs, for participation in the proceedings. 19-A M.R.S.A. § 105(1). In making this determination, the court may consider the relevant financial circumstances of the parties and which party is in a better position to bear the costs of litigation, whether the conduct of a party has contributed to the duration of litigation, and any other factors that reasonably bear on the fairness and justness of the award. *Estate of Ricci*, 2003 ME 84, ¶ 30, 827 A.2d 817 (citations omitted).

Plaintiff's present and former counsel have submitted affidavits of attorney fees and costs asserting that Plaintiff incurred a total of $246,174.31[3] in attorney fees and costs—$172,238.01 in attorney fees and $21,856.72 for disbursement reimbursements to Taylor McCormick & Frame, LLC and $52,079.58 in attorney fees and costs to Susan M.

---

[3] If the $21,856.72 for disbursement reimbursements to Taylor McCormick & Frame, LLC are not included in this calculation, the amount of attorney fees and costs is $224,317.59.

Schultz, LLC. Defendant's counsel submitted an affidavit asserting that she incurred a total of $243,701.72 in attorney fees and costs.

Issues of economic misconduct are addressed above, and, although economic misconduct could in theory justify an order requiring the wrongdoer to pay the victim's attorney fees, the court does not intend to penalize the Plaintiff twice for the same misconduct. However, the court agrees with the Defendant up to a point that, even apart from economic misconduct, Plaintiff's conduct caused her to incur additional attorney fees, and also that Plaintiff's application of $60,000 toward his own attorney fees involved funds in which Defendant had a reasonable expectancy and interest.

Based on the entire record, the court finds and concludes that Defendant is entitled to have Plaintiff reimburse her for $50,000 of her attorney fees. Plaintiff shall pay Defendant or her attorney $50,000 from his share of the funds in the parties' accounts at the time the funds are distributed to the parties.[4]

*XVII. Just and Equitable Allocation of Assets and Property*

The attached table sets forth the court's allocation of the property and assets of the parties. Property that is to be sold and the proceeds divided is listed and valued, but is not counted in the allocation. Likewise, non-marital property, post-filing accounts and property of limited or no value is not counted in the allocation. The $800,000 in NES and Dictator, Inc. income that the Defendant proved that Plaintiff appropriated from income of NES and Dictator

---

[4] The attached table on page 4 shows the amounts previously disbursed by the Referee to the parties. Plaintiff notes that the Referee has disbursed about $24,000 more to Defendant than to him. The court has considered this point in determining the fee award.

39

is imputed to him. Likewise, the $30,000 that Defendant appropriated from income of Ruby Red, Inc. is imputed to her.

The allocation does not include the proceeds of the sale of the properties to be sold, but those do not change the allocation ratio because the proceeds of sale are to be divided equally. The allocation also does not reflect the attorney fee award, because it is conceptually separate from the allocation of marital property.

Although not equal, the net values of marital assets and property allocated to the parties are just and equitable. The net value allocated to Defendant is higher than that allocated to Plaintiff only because the value allocated to her includes 70% of the marital component of the -3108 account to reflect her substantial contribution of $492,669 in non-marital funds to what is now the marital component of the account. As the last entry on the attached table shows, if the -3108 account is excluded from the allocation, the difference in values allocated is less than $2,000.

*XVIII. Transition and Sale of Properties and Disbursement of Proceeds*

Referee John Fidrych shall supervise the distribution of the bank and brokerage accounts listed in this Amended Judgment and the attached table, and confirm that the various amounts awarded to each of the parties herein are subtracted from the other party's share.

Referee Fidrych is hereby authorized, but is not required, to take immediate and full control of Dictator, Inc., Ruby Red, Inc., the Tremont properties and the Wharf properties and all assets and accounts associated with those properties. The parties are hereby ordered and enjoined to cooperate fully with the Referee in all respects, including turning over any and all books, records and other items requested by the Referee.

40

Any income available for distribution to the parties from any of the businesses, after payment of all expenses and fees of the Referee, shall be shared equally between them.

The Referee shall sell, in any commercially reasonable manner, including by auction, any and all right, title and of interest of either or both parties in the following:

- the fishing vessel Dictator and its licenses and permits, and all other assets of Dictator, Inc.

- the so-called Wharf property and all assets of Northeastern Seafood, Inc.

- the Tremont properties (including McKinley Market) and all assets of Ruby Red, Inc.

Unless the parties agree otherwise in writing, the sale of the Tremont properties shall be by auction, given the limited interest in the listing of those properties. The sale of the other properties may be by auction, by listing or any other commercially reasonable means. The sale of these properties may include any and all equipment, fixtures, vehicles and all tangible and intangible assets associated with any of the properties, except for any items specifically allocated to a party in this Amended Judgment or the attached chart.

This Amended Judgment assumes that the sale of the properties will be of assets rather than sale of the stock of the corporate entities owned by the parties, but a sale of stock may occur instead if deemed more financially advantageous to the parties than a sale of corporate assets. Assuming all assets of Dictator, Inc., Ruby Red, Inc. and Northeastern Seafood, Inc. are sold and all debts are paid, the parties shall cause those corporations to be dissolved.

The Referee is authorized to retain, on any commercially reasonable terms, the services of any broker, consultant, property manager or other service provider to protect the properties and prepare and list them for sale. Any commission or other compensation, or expense or

41

reimbursement due to the Referee, or to any broker, consultant, property manager or other service provider shall be paid through the Referee's account.

If any property is listed for sale and no purchase and sale agreement is signed within the first three months, the listing price for that property shall be reduced by five percent per month thereafter, unless the Referee expressly determines otherwise or the parties agree otherwise in writing.

The Referee is authorized to fund his fees and any costs or expenses associated with his activities by withholding equal amounts from each party's share of any account or sales proceeds, in a total amount sufficient to fund the Referee's fees and any costs or expenses.

The Referee shall assure that the parties, directly or through counsel, are informed of material developments and the terms of all listings, offers and other aspects of the sale process.

The Referee shall deposit the proceeds of any sale, net of closing costs, into the Referee's account. From the account, the Referee is authorized to satisfy his fee as well as any and all outstanding costs, commissions and expenses associated with the sale of any property. All taxes and expenses associated with the sale of property shall be considered a joint expense to the parties.

The parties are hereby ordered and enjoined to cooperate in all transactions, including but not limited to, the listing and sale of properties, and to execute any documents associated with any transaction. If either party fails or refuses to execute any document or engage in any transaction in the course of the sale of a business or any other aspect of this Amended Judgment, the Referee may apply to the court for authority to act on behalf of that party. *See* M.R. Civ. P. 70 (after notice and opportunity for hearing, court may appoint another person to

42

execute documents and act on behalf of a party who refuses or fails to execute documents or act).

*Conclusion*

IT IS ORDERED AND ADJUDGED AS FOLLOWS:

1.    The court has previously granted a divorce by means of the Order and Judgment Granting Divorce dated February 26, 2015.

2.    The parties' assets and property are allocated as set forth herein and on the attached table, which is hereby incorporated by reference.

3.    Any property of the parties not allocated herein or in the attached table is awarded to the party in possession of tangible property or the party in whose name intangible property is titled.

4.    Defendant's Motion to Enforce the November 3, 2015 Order is granted in part, to the extent set forth herein, and is otherwise denied.  Plaintiff's Motion to Strike the affidavit of Michael Cardente is granted to the extent set forth herein and is otherwise denied.

5.    Defendant is awarded $50,000 against Plaintiff toward her attorney fees and costs in this case.   Any costs or expense associated with this case, or with the sale of properties to third parties, including fees and expenses of the Referee, shall be allocated equally between the parties, except that any costs or expenses, including fees and expenses of the Referee, associated with the transfer of property awarded to only one party shall be borne solely by that party.

6.    Each party is awarded sole responsibility for any indebtedness associated with the property and assets awarded to that party, and shall hold harmless and indemnify the other

43

party against any and all claims, costs or liability associated with the debt, including costs of defense and attorney fees incurred as a result of any such claim, cost or liability.

7. Any loan or indebtedness as to which the parties are jointly liable shall be refinanced or discharged within 120 days by the party to whom the property encumbered by the loan or indebtedness is awarded, so as to eliminate the liability of the other party. This paragraph applies only to property awarded to only one party, and not to property to be sold by the Referee.

8. The parties are hereby ordered and enjoined to cooperate with each other and with the Referee in implementing the transactions contemplated in this Amended Judgment and executing any documents associated with such transactions.

9. The court invites counsel to prepare and submit an abstract of this Amended Judgment for recording if necessary.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Amended Judgment by reference in the docket.

Dated: August 16, 2016         _____s/_____

A.M. Horton
Justice, Business & Consumer Court

STATE OF MAINE                                    BUSINESS AND CONSUMER COURT

Cumberland, ss.


TIMOTHY W. HARPER,                    )
                                      )
                 Plaintiff            )
                                      )
      v.                              )          Docket No. BCD-FM-14-02 ✓
                                      )
SHERYL E. HARPER,                     )
                                      )
                 Defendant            )


                    ORDER ON MARITAL/NON-MARITAL STATUS
                    OF H.M. PAYSON ACCOUNT ENDING IN 3108

        This divorce case involves multiple properties and accounts.  By agreement of the

parties, certain issues that could be addressed through a discrete presentation of evidence were

heard in what was designated as Phase I of the case.   The Phase I trial began January 28, 2015

but was not completed due to a weather-related cancellation of court.   The Phase I trial

resumed in February 2015, but was suspended as to issues regarding the parties' commercial

real estate to enable the commercial real estate to be sold instead of awarded to one or the other

of the parties.

        Accordingly, the rulings in this order focus primarily on the status of one of the various

accounts maintained in the names of one or both parties with the H.M. Payson—namely an

account in Defendant's name to which H.M. Payson has assigned an account number ending in

3108 ["the account ending in 3108"].  The issue is the extent to which the funds in the account

are nonmarital funds of Defendant.   In July 2015, the parties filed proposed findings and

conclusions, with Plaintiff filing initially and also filing a reply to Defendant's filing.

        Based on the entire record, the court adopts the following findings and conclusions.

These findings and conclusions likely will be incorporated by reference in the court's final

                                            1

judgment in this case, which must await trial in April 2016, when trial on all remaining issues is scheduled to occur.

*Findings Of Fact and Conclusions of Law*

A. The Parties' Businesses and Accounts

1. Plaintiff Timothy Harper and Defendant Sheryl Harper were married on July 3, 1978. They have four grown children.

2. Shortly after the parties married, they moved to Maine. The parties purchased a fishing boat, with financial assistance from Sheryl Harper's parents, and Timothy Harper began taking the boat to sea to harvest scallops. The parties began operating Fish Unlimited, an unincorporated wholesale seafood business, about 30 years ago. It began when Mr. Harper decided to sell the scallops directly to local buyers, rather than through an agent. Sheryl Harper's role was to sell the scallops, operating out of the parties' residence.

3. Over time, the Fish Unlimited business expanded by purchasing seafood from other fishermen as well, for resale. As the business grew, Mr. Harper built a structure next to the parties' home to serve as a warehouse for Fish Unlimited. The parties expanded the Fish Unlimited operations over the years, mainly through Sheryl Harper's efforts: traveling to various docks throughout New England, buying seafood directly from the boats on the docks, and then transporting the seafood for sale to restaurants and wholesalers. During these years, Timothy Harper captained various fishing vessels owned by the parties and, along with other fishermen, supplied seafood to Fish Unlimited for resale.

4. After the parties purchased a wharf at 126 Clark Road in Southwest Harbor, Fish Unlimited continued its wholesale seafood operations, expanding to purchasing and selling retail and wholesale lobsters. At one point Fish Unlimited ran a restaurant on the dock.

2

5. At some point, the parties formed a corporation, Northeastern Seafood, Inc. (NES), and the operations of Fish Unlimited continued under the auspices of NES although NES sold bait, gas, lobster and other items beyond what Fish Unlimited had sold. Mr. Harper was actively managing NES, although Sheryl Harper continued to manage what had been the operations of Fish Unlimited.

6. Partly as a result of a downturn in the scallop market, what had been the Fish Unlimited business effectively ceased operating around 2006-2007, when the parties purchased McKinley Market and the surrounding properties in Tremont and purchased the Dictator offshore scallop fishing vessel. At that time, Timothy Harper stopped fishing and began managing the fishing operations of the Dictator, including hiring a captain to run the vessel during fishing trips. At the same time, Sheryl Harper began managing McKinley Market and Timothy Harper took responsibility for operating Northeastern Seafood, with a primary focus on the purchase and sale of lobsters from the 126 Clark Road dock owned by the parties.

7. While Sheryl Harper was primarily managing the operation of the Fish Unlimited business, income from the business paid the parties' mortgages, real estate taxes, insurance, housing expenses, household expenses, clothing, food, transportation and expenses for the parties' four children. What Timothy Harper earned from fishing mainly went to expenses associated with the fishing boat and to vehicles associated with the boat and Fish Unlimited.

8. Although both parties have played a substantial role in the significant growth in their marital assets over the past 30 years, Sheryl Harper has historically been more involved than Timothy Harper in administering the parties' funds and accounts. She appears to have been the spouse who arranged for accounts to be opened, closed and transferred, and the spouse who dealt with the managers of the various bank and investment accounts the parties have had over the decades.

3

9. In the 1990s, she arranged for accounts to be opened in the parties' names at the former national investment firm known as A.G. Edwards. The A. G. Edwards accounts included separate IRA accounts for both parties, a joint brokerage account, and an account in Sheryl Harper's name only. By November 1997, the joint account totaled $90,787.42. By November, 1999, Timothy Harper's IRA had a balance of $14,320.55 and Sheryl Harper's two IRAs totaled $16,073.47.

10. The parties also entered into a series of personal and commercial banking relationships with a local financial institution, the First National Bank of Bar Harbor. The trust officer at First National who was assigned to the Harpers' various accounts was Daniel Lay. At some point, First National Bank formed a wealth management department called First Advisors, and the parties' accounts were moved to First Advisors, where Mr. Lay continued to manage them.

11. The account primarily at issue in this Order is an account in Sheryl Harper's name alone assigned an account number ending in 3463. It was originally opened at The First and later moved to First Advisors.

12. Also among the accounts opened at The First and moved to First Advisors was an account in the name of Northeastern Seafood, into which Sheryl Harper deposited funds earned from Fish Unlimited and then NES. The two IRA accounts at A. G. Edwards were also transferred to First Advisors to be managed by Mr. Lay.

13. Funds saved from the operation of Fish Unlimited in a deposit account ending 6651 in Sheryl Harper's sole name at First National Bank of Bar Harbor. In January, 2005, this account had a balance of $623,041.60. On April 1, 2005, $600,000 from this account was transferred to her First National Bank of Bar Harbor investment account, where it briefly remained until after the merger forming The First. After the merger, Sheryl Harper opened a

4

new First Advisors investment account ending 6020 in September, 2005 in the name of NES d/b/a/ Fish Unlimited. (Def. Exh. 16). On September 23, 2005, Sheryl deposited $414,681.25 from her individual First Advisor account ending 3463 into the NES d/b/a Fish Unlimited First Advisor account ending 6020. On October 5, 2005, Sheryl deposited $185,132.11 from her individual account into the NES d/b/a Fish Unlimited account. The NES d/b/a Fish Unlimited account had a balance of $615,992.94 on September 8, 2006.

14. In 2006, Mr. Lay left the employ of First Advisors and joined the H. M. Payson investment firm. In order to maintain his involvement in managing the accounts, the parties transferred all of their accounts at First Advisors to the H. M. Payson firm, and also transferred the joint brokerage account at A.G. Edwards.

15. H. M. Payson assigned the IRA accounts for Timothy and Sheryl Harper account numbers ending in 3156 and 3129 and the parties' H.M. Payson joint account an account number ending in 3162. H. M. Payson assigned the Northeastern Seafood account an account number ending in 4103, and assigned the former First Advisors account in Sheryl Harper's name only an account number ending in 3108. Another H. M. Payson account is the so-called Dictator capital construction account, with an account number ending in 3171. This account was funded with deposits from the operations of the Dictator vessel, which are managed by Timothy Harper.

16. In December 2008, funds in the Northeastern Seafood account ending in 4103 were transferred to the H.M. Payson joint brokerage account ending in 3162. Aside from reinvested income and dividends, this deposit of funds from the Northeastern Seafood account has been the only addition since 2006 to the funds in the parties' joint H.M. Payson account ending in 3162.

17. At all times, Mr. Lay's management of the parties' investment accounts involved the purchase and sale of securities within the account and reinvestment of interest and dividends to

5

purchase new securities. All purchases were made from either the sale of securities within the account or from the routine reinvestment of interest and dividends.

Sheryl Harper's Account Ending in 3108

18. With regard to the 3108 account specifically, although Mr. Lay would occasionally see or talk to Sheryl Harper, Sheryl Harper gave him full discretionary authority to manage the account. Sheryl Harper did not direct the management of the account. Her actions were nominal, inconsequential, or sporadic. She did not invest substantial marital time and energy in managing the assets in the account.

19. The origins of the H.M. Payson account in Sheryl Harper's name only ending in 3108 go back to a gift of stock she received from her parents in the 1990s. The stock was transferred to the A.G. Edwards account in Sheryl Harper's sole name. No stock certificates were given to Sheryl Harper. Although she does not recall the individual stocks gifted to her decades later, she specifically recalls providing her mother with contact information for her A.G. Edwards broker to facilitate an electronic transfer of the gifted stock to an investment account in her sole name at A.G. Edwards. No marital funds were deposited in the account while it was being administered by A.G. Edwards individual account in Sheryl Harper's name.

20. Sheryl Harper received a second gift of stock from her parents between 2001 and 2003. This gift was made by her parents because they had assisted her brother with the building of his house and decided to make a similar gift to her. The stock was directly transferred from her parents to the newly opened account in her sole name at the trust department of First National Bank of Bar Harbor. The stock gift was managed by the trust department of First National Bank of Bar Harbor. All income from the account was reinvested in the account to purchase additional securities. No marital funds were deposited into this account.

6

21. On December 31, 2004, the value of Sheryl's individual stock and securities account ending 3463 at the First National Bank of Bar Harbor was $205,165. The same account had a balance of $213,323 on December, 31, 2005.

22. In June 2006, Sheryl Harper liquidated her individual A.G. Edwards account and sold the stock her parents had given her as a gift in the 1990s. Thereafter, she transferred the proceeds of the stock sale to her individual First Advisors investment account ending 3463. On September 8, 2006, Sheryl Harper's individual First Advisors investment account ending 3463, had a balance of $331,544.13. The sole source of these funds was the stock gifted to her by her parents in the 1990s and originally held in her individual A.G. Edwards account before its liquidation in June, 2006, and the stock gifted to her by her parents between 2001 and 2003 originally held in her individual First National Bank of Bar Harbor investment account ending 3463 02 8.

23. In September, 2006, when Daniel Lay left First Advisors and began working at H.M. Payson, all of the investment assets and cash in Sheryl Harper's individual First Advisor account ending in 3463 were transferred in September 2006, to the account ending 3108 at H.M. Payson, still in Sheryl Harper's sole name.

24. Sheryl Harper also saved the parties' earnings money from Fish Unlimited in an investment account with Royal Alliance. On April 11, 2007, the sum of $69,374.68 was transferred from Royal Alliance into Sheryl Harper's individual H.M. Payson account ending 3108.

25. Funds in the amount of $144,962.35 from the H.M. Payson NES d/b/a Fish Unlimited account ending 4103 were transferred into the parties' joint H.M. Payson account ending 3162. On February 9, 2009, one-half this amount ($72,481.18) was transferred to Sheryl Harper's individual H.M. Payson account ending 3108

7

26. In 2010, Sheryl Harper withdrew funds from her individual H.M. Payson account ending 3108 for legal fees related to a dispute over her mother's estate. The balance of the account prior to withdrawal was $506,786.17 on March 31, 2010, and the balance of the account on December 31, 2010, after the withdrawals was $385,628.78.

27. In March and April, 2011, Sheryl Harper received stock from her mother's estate. The inherited stock from Sheryl's mother's estate was directly transferred into her individual H.M. Payson account ending 3108. (Def. Exh. 29). The value of the stock inherited by Sheryl and deposited into her individual account on March 24, 2011, was $202,388.58. The value of the stock inherited by Sheryl and deposited into her individual account on April 5th and 6th, 2011 was $60,726.80.

28. The balance of Sheryl Harper's individual H.M. Payson account ending 3108 on June 30, 2011 was $684,287.58. All stock inherited by Sheryl Harper, with the exception of 100 shares of Apple stock,[1] was sold within the individual investment account by her investment manager, Daniel Lay. The proceeds of all of the sales of her inherited stock was exchanged for other stock purchased and sold in the course of Daniel Lay's management of the account. All interest and dividend income earned on the inherited stock was routinely reinvested in Sheryl's individual account.

29. A check in the amount of $98,969.10 received by Sheryl Harper from her mother's estate was not deposited in her H.M. Payson individual account ending 3108. This nonmarital inheritance was used to make a $25,000 gift from Sheryl to each of the parties' four children.

---

[1] The 100 shares of Apple stock inherited by Sheryl from her mother and deposited in the account on March 24, 2011 has since had a 7-1 stock split on and now consists of 700 shares of Apple.

8

## The Legal Framework

30. The court is to follow a three-step analysis in distributing property in a divorce action. *Ayotte v. Ayotte*, 2009 ME 20, ¶ 6, 966 A.2d 883. The Court must "(1) determine what of the parties' property is marital and non-marital, (2) set apart each spouse's non-marital property, and (3) divide the marital property between them in such proportion as the court deems just." *Id.* The divorce statute mandates the court "*shall* set apart to each spouse the spouse's property and *shall* divide the marital property." *Miliano v. Miliano*, 2012 ME 100 ¶ 14, *citing* 19-A M.R.S. § 953(1) (2011) (emphasis in original).

31. There is a statutory presumption that all property acquired subsequent to marriage is marital property regardless of how title is held. 19-A M.R.S. § 953(3). The presumption may be overcome, however, by a showing the property was acquired by one of the exceptions to the definition of marital property set forth in 19-A M.R.S §953(2):

> A. Property acquired by gift, bequest, devise or descent;
>
> B. Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise or descent;
>
> C. Property acquired by a spouse after a decree of judicial separation;
>
> D. Property excluded by valid agreement of the parties; and
>
> E. The increase in value of property acquired prior to the marriage and the increase in value of a spouse's non-marital property as defined in paragraphs A to D.
>
> > (1) "Increase in value" includes:
> >
> > > (a) Appreciation resulting from market forces; and
> > > (b) Appreciation resulting from reinvested income and capital gain unless either or both spouses had a substantial active role during the marriage in managing, preserving or improving the property.

(2) "Increase in value" does not include:

    (a)    Appreciation resulting from the investment of marital funds or property in the nonmarital property;

    (b)    Appreciation resulting from marital labor; and

    (c)    Appreciation resulting from reinvested income and capital gain if either or both spouses had a substantial active role during the marriage in managing, preserving or improving the property.

19-A M.R.S §953(2); P.L. 1999 c.665, § 1. *See Warner v. Warner*, 2002 ME 156, 807 A.2d 607 (applying the statute to determine whether increase in value was marital).

32. In *Hedges v. Pitcher*, 2008 ME 55, 942 A.2d 1217, the Law Court set forth the allocation of the burden of proving whether appreciation of a non-marital asset is marital or non-marital. The burden initially falls on the party asserting the property is marital to prove that non-marital property appreciated in value during the marriage. *See Warren v. Warren*, 2005 ME 9, ¶26, 866 A.2d 97, 103. Proving an increase in value is an essential element of the burden of proof. *Miliano* at ¶25.

33. If appreciation in value during the marriage is established, the statute creates the rebuttable presumption that the increase in non-marital property's value is marital. *See* 19-A M.R.S. § 953(2),(3). To rebut the statutory presumption, the party asserting the appreciation in value is non-marital then bears the burden to show appreciation during the marriage remains non-marital because it resulted from either "market forces," 19-A M.R.S. § 953(2)(E)(1)(a), or from "reinvested income and capital gain," *id.* § 953(2)(E)(1)(b). *See Warren*, 2005 ME 9, ¶ 26, 866 A.2d at 103.

34. If the party asserting the property is non-marital meets the burden of proving market forces caused appreciation in the value of non-marital property during the marriage, the

10

amount of that appreciation remains non-marital, whether or not either spouse played a substantial active role in managing, preserving or improving the property. *Warner v. Warner*, 2002 ME 156, ¶ 31, 807 A.2d 607, 620.

35. If the Court finds an increase in the value of a non-marital asset resulted from reinvested income and capital gain, then, and only then, does the issue of whether a spouse played a substantial active role in managing, preserving or improving the property arise. *Id.* (citing 19-A M.R.S. § 953(2)(E)(1)(b),(2)(c)). If this issue is reached, the factors a court should consider in determining whether there has been a substantial active role in managing, preserving or improving the property include:

> (1) whether a spouse engaged in routine reinvestment, or instead, actively managed the asset;
>
> (2) whether the actions of a spouse were nominal, inconsequential, or sporadic;
>
> (3) whether a spouse invested substantial marital time and energy in managing the asset;
>
> (4) whether a spouse had an occupation separate from managing that property; and
>
> (5) whether a spouse's knowledge of and involvement with the property is casual or in-depth.

*Hedges v. Pitcher*, 2008 ME 55 ¶ 27, 942 A.2d 1217, 1225.

Application of Law to Fact

36. The core issue is to what extent the funds in the H.M. Payson account in Sheryl Harper's name ending in 3108 only are marital or nonmarital.

37. The evidence affirmatively establishes the following:

- The funds in the 3108 account derive from Sheryl Harper's nonmarital funds and the parties' marital funds.

- The nonmarital assets and cash transferred into the 3108 account and its predecessor accounts at First Advisors, The First, First National and A.G. Edwards total $492,669.

- The marital funds transferred into the account consist of the Royal Alliance transfer and the transfer from the NES account, totaling $150,110.

- The 3108 account had a balance of $861,384.75 as of December 31, 2014.

- The only asset in the 3108 account that can definitively be designated as nonmarital is the Apple stock. This is because all of the other nonmarital stock gifted to Sheryl Harper and transferred into the 3108 account has been sold, and the proceeds of those sales, along with all of the nonmarital cash that was deposited into the 3108 account, have been inextricably commingled with marital cash and used to purchase stock or other types of investments.

- Because of the extensive commingling of marital and nonmarital funds in the 3108 account, it cannot be determined how much of the December 2014 balance of $861,384.75 is attributable to nonmarital contributions. In other words, although the evidence establishes a nonmarital contribution totaling $492,669, the fact that all of it except for the 700 shares of Apple stock has been commingled with marital funds and used to pursue a variety of different stocks and other investments means that how much of the account's current value stems from the nonmarital contribution is unknown.

- The fact that the 3108 account's December 2014 balance is more than $219,000 greater than the combined marital and nonmarital contributions to the account clearly supports the inference that the difference reflects an increase in value, but the extensive commingling of marital and nonmarital funds makes it impossible

12

to determine how much of the increase stems from marital funds versus nonmarital funds, except for the increase in value of the Apple stock.

- Neither party had a substantial active role in managing the 3108 account or any of the predecessor accounts at various financial institutions. Although Sheryl Harper was more involved than Timothy Harper in all of the parties' various accounts throughout the time those accounts were at the various financial institutions or brokerage firms mentioned above, at no time did her involvement in any of them, including the 3108 account, amount to a substantive active role for purposes of section 953(2)(E)(2)(c). Instead, both parties left active management and oversight of all of the accounts to Daniel Lay and, before him, to other managers at the financial institutions or brokerage firms involved.

38. Applying the statutory burden analysis to the 3108 account, the initial issue applies to whether the assets themselves (independent of any increase) are marital or non-marital. Because all the assets were acquired during the marriage, Defendant Sheryl Harper has the initial burden to demonstrate that the assets are in fact non-marital because they were gifted to her. The only asset in the account that consists of a gifted asset is the Apple stock. Because of the extensive commingling of marital and non-marital assets and cash that has occurred over the years, none of the other assets in the 3108 account consists of a gifted asset, nor can any other asset in the account be specifically traced to a gifted asset. The court finds and concludes that the only current asset in the 3108 account that has been established to be non-marital is the Apple stock.

39. With respect to the non-marital Apple stock, Plaintiff Timothy Harper has met his burden to show an increase during the marriage in the value of the stock, thereby triggering the statutory presumption at 19-A M.R.S. § 953(3) that the increase is marital.

13

Because the increase in value of the Apple stock was entirely due to market forces or reinvested income and capital gains, and because she had no active role in managing the 3108 account, Sheryl Harper has also met her burden to overcome the presumption. Accordingly, the entire value of the Apple stock will be set aside to her.

40. Although the court has concluded that Defendant Sheryl Harper has not established that most of the value of the 3108 account consists of non-marital property, the fact that about three-quarters of the contributions into the account were of Sheryl Harper's nonmarital funds, coupled with the fact that the account has increased in value by nearly $220,000, is by no means an irrelevant consideration. Nothing in this order should be deemed to foreclose any justifiable allocation of the marital component of 3108 account on the basis of an equitable allocation or economic misconduct. Because these issues will be raised at the trial scheduled for April 2016, and may be visited earlier at the upcoming interim hearing, the court will defer allocating the 3108 account other than the nonmarital Apple stock and any proceeds directly traceable to that stock.

Pursuant to M.R. Civ. P. 79(a), the Clerk is directed to incorporate this Order by reference in the docket.

Dated October 20, 2015

A. M. Horton
Justice, Superior Court

Entered on the Docket: 10-22-15
Copies sent via Mail ___ Electronically X

14

**Timothy W. Harper v. Sheryl E. Harper**

**BCD-FM-14-02**

## Plaintiff

**Timothy W. Harper.,**
      Counsel:                          *Adam Taylor, Esq.*
                                      *H. Teeters Trumpy, Esq.*
                                      30 Milk St/ 5th Floor
                                      Portland, ME 04101

## Defendant

**Sheryl E. Harper**
Counsel:                           *Kristin Gustafson, Esq.*
                                      295 Water St. Suite 218
                                      PO Box 2147
                                      Augusta, ME 04338